**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF NEW YORK**

--------------------------------------------------------------------X

JOHN DOE,                                                    :

                        :  **Civil Action No:** 5:17-CV-1298 (FJS/ATB)

         **Plaintiff,**                                :

                        :

                        :  **COMPLAINT**

       **-against-**                              :

                        :  **JURY TRIAL DEMANDED**

COLGATE UNIVERSITY and COLGATE            :

UNIVERSITY BOARD OF TRUSTEES,             :

                        :

      **Defendants.**                            :

--------------------------------------------------------------------X

Plaintiff John Doe[1] (hereinafter referred to as "Plaintiff" or "John Doe"), by his attorneys Nesenoff & Miltenberg, LLP, as and for his Complaint, respectfully alleges as follows:

**THE NATURE OF THIS ACTION**

1.    This case arises out of the actions taken and procedures employed by Defendants Colgate University ("Defendant Colgate" or "Colgate" or the "University") and Colgate University Board of Trustees ("Defendant Board of Trustees") (collectively, "Defendants") concerning actions taken against Plaintiff, a male freshman student at Colgate, as a result of false allegations of nonconsensual sexual intercourse with fellow Colgate freshman student Jane Roe.[2]

2.    John Doe was falsely accused by Jane Roe of rape.

3.    Doe was coerced and intimidated by the New York State Police – on Colgate's campus, with the help of Colgate officials, and with Colgate's express or implied consent – and charged with a crime he did not commit.

---

[1] Plaintiff herewith files a Motion to proceed pseudonymously.
[2] Plaintiff refers to Roe pseudonymously.

4.      During Colgate's investigation into Roe's complaints, Defendants made affirmative representations to Doe, withheld evidence from him, and conducted an investigation designed not to seek out the truth, but to bolster the female complainant's false and shifting narrative of events.

5.      Then, a biased Hearing Panel found Doe responsible for non-consensual sexual intercourse with Roe on the basis that Roe was purportedly asleep when the sexual encounter began ("the Decision"), even though Roe admitted, during the Hearing, to being an active participant in that act of intercourse, including by willingly switching positions and engaging with Doe while on top of him.

6.      On the basis of the erroneous Decision, Doe was expelled from Colgate ("the Sanction").

7.      The Sanction, like the Decision, was imposed as a result of a bias against men. Colgate made clear that the reason for the severity of the sanction was that the act for which Doe was found responsible involved a particular kind of non-consensual sex: "penile vaginal penetration."

8.      A non-exhaustive list of Defendants' wrongful actions include the following: (i) Defendants failed to conduct a thorough and impartial investigation; (ii) Defendants evidenced a gender bias against John Doe as the male accused throughout the investigative and hearing process; (iii) Defendants made assessments of credibility and evidentiary weight with respect to each party and witness without any ascertainable rationale or logic; (iv) Defendants failed to afford John Doe the requisite presumption of innocence required by a preponderance of the evidence standard; and (v) the Sanction was unwarranted and disproportionate in light of the

circumstances, all of which demonstrated substantial errors in violation of Title IX and other federal and/or state laws.

9.      As a result of Defendants' discriminatory and unlawful conduct, Doe was denied the opportunity to continue his education at Colgate and lost the financial benefits that accompanied his acceptance into Colgate. Moreover, he was ostracized from his friends and from the campus community, made a social pariah, and forever damaged emotionally by the excruciating and unfair process and the terribly unjust results flowing therefrom. Doe has also sustained damages to his future education and career prospects as a result of the Decision and Sanction.

10.     John Doe therefore brings this action to obtain relief based on causes of action for violations of Title IX of the Education Amendments of 1972, breach of contract, and other state law causes of action.

## THE PARTIES

11.      Plaintiff is a natural person, citizen of the United States, and resident of the State of New York. During the events described herein, Plaintiff was a student at Colgate University and resided on Colgate's campus in Hamilton, New York.

12.     Upon information and belief, Defendant Colgate is a private, liberal arts college located at 13 Oak Drive, Hamilton, New York 13346.

13.     Upon information and belief, Defendant Board of Trustees is the governing body of Colgate University. It is composed of thirty-five (35) members who are alumni, parents of students and the President of Colgate. Upon information and belief, it oversees and approves Colgate's written policies.

14.     John Doe and Defendants Colgate and Board of Trustees are sometimes hereinafter collectively referred to as the "Parties."

## JURISDICTION AND VENUE

15.     This Court has federal question and supplemental jurisdiction pursuant to 28 U.S.C. § 1331 and 28 U.S.C. § 1367 because: (i) the federal law claim arises under the constitution and statutes of the United States; and (ii) the state law claims are so closely related to the federal law claim as to form the same case or controversy under Article III of the United States Constitution.

16.     This Court has personal jurisdiction over Defendant Colgate on the grounds that it is conducting business within the State of New York.

17.     This Court has personal jurisdiction over Defendant Board of Trustees on the grounds that it is conducting business within the State of New York and is the governing body of Colgate University.

18.     Venue for this action properly lies in this district pursuant to 28 U.S.C. §1391 because Colgate is considered to reside in this judicial district and a substantial part of the events or omissions giving rise to the claim occurred in this judicial district.

## FACTUAL ALLEGATIONS COMMON TO ALL CLAIMS

### Agreements, Representations, Covenants and Warranties Between Plaintiff and Colgate University

19.     Prior to matriculating at Colgate University, Doe attended a small, private high school in New York, New York, where he was engaged and active in his school community. He was a member of the Christian Service Society for four years; served as chairperson of the Special Olympics Committee during his junior and senior years; played on the ultimate Frisbee team for four years and served as its captain for one year; and was a member of the Science

Olympiad team during his junior and senior years. He also received an award in his senior year for maintaining a grade point average ("GPA") of at least 3.8 in all of his classes.

20.     In the fall of 2016, Doe began his college career as a freshman at Colgate, where he excelled academically. He made the Dean's List with Distinction his first semester, having achieved a GPA of at least 3.6, and was also on the Dean's List his second semester with a GPA of 3.43. In addition to his academic achievements, he was a member of the Colgate Men's Crew Team during the first semester of his freshman year, and worked for the University's catering company during his second semester.

21.     Upon John Doe's acceptance to the University, Colgate provided Doe with copies of its school policies, including the Colgate University Student Handbook (the "Handbook"), the 2016-2017 edition of which is available on Defendant Colgate's website.

22.     The Handbook sets forth the procedures by which Colgate students who have been accused of violating one or more of the enumerated policies concerning sexual discrimination, sexual harassment, and sexual assault (sometimes collectively referred to herein as "sexual misconduct") are investigated, heard, and, possibly, disciplined (the "Equity Grievance policies and procedures").

23.     The Equity Grievance policies and procedures are in large part a product of a "guidance letter" issued to all colleges and universities in the United States on April 4, 2011, by the Office of Civil Rights ("OCR") of the U.S. Department of Education ("DOE"), widely known as the "Dear Colleague" letter ("DCL").

24.     The DCL advised recipients that sexual violence constitutes sexual harassment within the meaning of Title IX of the Education Amendments of 1972, 20 U.S.C. §1681 *et seq.*

and its regulations, and directed schools to "take immediate action to eliminate the harassment, prevent its recurrence, and address its effects."

25.     On April 29, 2014, OCR issued additional directives to colleges and universities in the form of a guidance document titled *Questions and Answers on Title IX and Sexual Violence* ("Q&A"). Like the DCL, the Q&A was aimed at addressing educational institutions' sexual misconduct policies, including the procedures schools "must" have in place "to prevent sexual violence and resolve complaints" and the elements that "should be included in a school's procedures for responding to complaints of sexual violence."

26.     On September 22, 2017, OCR rescinded the DCL and put in place an interim guidance while the current administration reviews and revises its practices with regard to the adjudication of complaints of sexual misconduct on college campuses receiving federal funding. *See*, *e.g.*, https://www.ed.gov/news/press-releases/department-education-issues-new-interim-guidance-campus-sexual-misconduct.

27.     The interim OCR guidance, in a significant departure from the 2011 DCL, states: "The findings of fact and conclusions should be reached by applying either a preponderance of the evidence standard or a clear and convincing evidence standard," as long as the standard for evaluating claims of sexual misconduct is the same as that applied in other student disciplinary proceedings. The interim guidance also requires that "[a]ny rights or opportunities that a school makes available to one party during the investigation should be made available to the other party on equal terms."

28.     The interim OCR guidance, as well as the accompanying review of OCR's prior guidance documents, suggest that the Equity Grievance policies and procedures in place at all times relevant to this lawsuit – which were tailored in such a way as to comply with the DCL

6

under threat of loss of federal funding – were unfair and, ultimately, out of step with the goal of gender equity in Title IX-related proceedings. *See* "Q&A on Campus Sexual Misconduct," available at https://www2.ed.gov/about/offices/list/ocr/docs/qa-title-ix-201709.pdf.

29.     In addition to the directives set forth in the DCL and later guidance documents, the State of New York requires all public and private colleges and universities to adopt a specific set of procedures and guidelines in order to continue receiving State funds.

30.     On July 7, 2015, New York State's governor signed into law comprehensive legislation concerning campus sexual assault known as the "Enough is Enough" law, Education Law Article 129-B (hereafter "Enough is Enough" or "Art. 129-B"). According to the State's website: "By standing up and saying 'Enough is Enough,' we made a clear and bold statement that sexual violence is a crime, and students can be assured they have a right to have it investigated and prosecuted as one." *See* https://www.ny.gov/programs/enough-enough-combating-sexual-assault-college-campuses.

31.     On information and belief, Colgate substantially revised its Equity Grievance policies and procedures in October of 2015 in response to Art. 129-B.

32.     At all times relevant to this litigation, Colgate's Equity Grievance policies and procedures had to conform to the requirements of both the DCL and "Enough is Enough." If the policies and procedures were not in compliance, Colgate risked losing millions of dollars in state and federal funding.

33.     With respect to cases involving sexual misconduct, Colgate's Handbook states in relevant part:

> This policy prohibits acts of discrimination, harassment, sexual assault and sexual exploitation . . . . Any and all such acts are serious violations of our community values. This policy is a fundamental part of a Colgate community where all

members can study, live, and work together in a community characterized by equal opportunity, inclusiveness, safety and mutual respect.

Colgate fully subscribes to all federal and state civil rights laws banning discrimination in private institutions of higher education. These include but are not limited to Title IX . . . of the Education Amendments of 1972, Title VII of the Civil Rights Act of 1964, . . . , the New York State Human Rights Law, and New York State Education Law Article 129-B. Colgate is committed not only to compliance with these laws but with promoting a community that lives out the values these equal opportunity laws envision.

34.     A complaint that alleges sexual misconduct is addressed through Colgate's Equity Grievance Process, which "provides procedures for the investigation and adjudication of violations of the Equity Grievance Policy."

35.     The Equity Grievance Panel ("EGP") is comprised of members who are "trained in all aspects of the grievance process," including complaint intake; counseling complainants; mediating conflicts; investigating complaints; advising those involved in complaints; serving on panels that hear complaints; and serving on appellate panels.

36.     EGP members are also required to receive annual training, including training on the effects of sexual trauma on alleged victims (also known as "trauma-informed" training). In addition, "advanced training in investigation protocol and the appellate process is provided annually to subsets of the EGP members who serve as investigators or appellate panel members for complaints covered by the Equity Grievance Policy."

37.     Following Colgate's receipt of a complainant's notice of violation or complaint, the complainant is promptly given the opportunity to select an EGP member or other individual to serve as an adviser. The complainant is also immediately provided information concerning her rights and responsibilities, including the right to be free from retaliation for filing the complaint and, pursuant to Art. 129-B, her right to support services provided by Colgate and/or community organizations with which Colgate has relationships. Thus, the complainant is able to receive

assistance and guidance from the outset, before a respondent is even aware that a complaint has been filed against him, and is at all times protected from retaliation, whereas a respondent is not given that protection at all.

38.     Furthermore, on information and belief, Colgate neither provides nor has formal relationships with organizations that provide support services for men accused of sexual misconduct.

39.     After a complaint is received, the Associate Provost for Equity and Diversity makes an initial determination as to whether a policy violation may have occurred and/or whether conflict resolution might be appropriate, based solely on the information contained within the complainant's notice of violation or complaint.

40.     Colgate's policies do not require that any notification be given to the respondent when a notice of violation or complaint is filed against him. In fact, Colgate does not require that any notice be given to the respondent unless and until the University commences an investigation into the complaint, and even then, the respondent is only entitled to notice of the investigation at some unspecified time "in advance of any interview or other meeting they are required or entitled to attend."

41.     In cases where a complaint appears to allege a policy violation and Colgate decides to investigate, the Associate Provost for Equity and Diversity appoints an EGP member or members to conduct the investigation. Per the Handbook, the investigating member(s) must be free from any conflict of interest.

42.     Colgate's policies and procedures require that the complainant and respondent have an equal opportunity to share information and request that witnesses be interviewed during the investigation. However, the Handbook does not identify any specific procedures that the

investigator(s) must follow; rather, it provides the investigator(s) with complete discretion "to determine how to conduct the investigation and what information is necessary and relevant," thus allowing the investigator to selectively present the facts he or she deems relevant, rather than produce an objective, thorough and impartial investigation report.

43.     Once an investigation is completed, the investigator(s) will meet with the Associate Provost for Equity and Diversity and the EGP co-chair to determine whether the results of the investigation warrant proceeding with the complaint process. In cases where the alleged behavior is one that may result in the imposition of a suspension or expulsion, the matter will normally proceed to a formal hearing.

44.     Should the matter proceed to a formal hearing, the Associate Provost for Equity and Diversity will appoint a non-voting panel chairperson (the "EGP Chair" or "the Chair") and three members of the EGP to serve on the Hearing Panel (the "Panel"). EGP hearings are to be convened within one or two weeks of completion of the investigation.

45.     At least one week prior to the hearing, the designated Chair will send a Notification of Charges letter to the parties stating the following: a description of the alleged violation(s) and a description of applicable procedures; the time, date and location of the hearing; the right to an adviser; and a reminder that retaliation against a *complainant*, or someone who supported or assisting *the complainant*, is a serious violation of the policy.

46.     Colgate's policies enable the EGP Chair to act as gatekeeper, giving the Chair the authority to select what information, evidence and witnesses should ultimately be presented to the Panel. Consequently, the EGP Chair has the power to essentially predetermine the outcome of the hearing by selectively crafting the narrative.

47.     For instance, prior to the hearing, the parties may submit the names of all witnesses the party intends to call and a brief description of the subject(s) about which the party believes the witnesses have relevant information, but the EGP Chair may exclude any witnesses he or she deems irrelevant.

48.     Similarly, the Chair may determine whether or not witnesses must be physically present at the Hearing, or if the investigator can instead "adequately summarize[]" the witnesses' testimony. This practice not only deprives respondents of the ability to confront and cross-examine adverse witnesses, but allows an investigator to selectively present witness testimony in any way he or she deems "adequate."

49.     Further, the Chair has full discretion to determine what information may be considered at the hearing, including hearsay and even double hearsay.

50.     After the presentation of evidence, the Hearing Panel deliberates in a closed session to determine whether the respondent is responsible for the misconduct alleged, based on a preponderance of the evidence standard.

51.     If a respondent is found responsible by a majority of the Panel, it moves to a consideration of sanction(s). At that time, each party may submit written impact statements and character references.

52.     Factors the Panel considers when determining a sanction include: the nature, severity and circumstances surrounding the violation; previous disciplinary history; previous complaints or allegations involving similar conduct; the need for sanctions to bring an end to the behavior; and the need for sanctions to prevent future recurrence.

53.     The parties receive simultaneous written notification of the outcome, which must include a rationale for the outcome. The notification also includes information with respect to appeal procedures.

54.     Appeals must be submitted in writing within ten (10) calendar days of the delivery of the written findings. An appeal may be based on the following grounds: a procedural error or omission occurred *during the EGP hearing* which, based on the entire record, is reasonably likely to have changed the outcome; new information unavailable during the EGP hearing or investigation has come to the attention of one of the parties, which is reasonably likely to have changed the outcome; or any sanction imposed was disproportionate to the nature or severity of the violations.

55.     Notably, appeals may not be based on procedural errors that occurred during the *investigation* phase, thus allowing Colgate to conduct investigations in whatever manner it chooses.

56.     In addition to setting forth the Equity Grievance policies and procedures, the Handbook also confers on all Colgate students certain "rights and responsibilities." In relevant part, the Handbook provides:

> [T]he University recognizes the need to protect the inviolability of the student's personal and civil rights: specifically, the right to be secure in one's person, speech, living quarters, papers, and effects against unreasonable search and seizure; and **the freedom from disciplinary sanction except by due process**, with avenues of recourse available when a student claims to have been subjected to prejudicious, discriminatory, or capricious treatment.

(Emphasis added.)

57.     On information and belief, Defendant Board of Trustees reviewed and authorized the Handbook in its current form.

**The October 30, 2016 Incident**

58.     On October 29, 2016, John Doe, a member of the Colgate Men's Crew Team, was at a party at the "Crew House" with other members of the team. He consumed alcohol while there, but was not intoxicated.

59.     Doe left the Crew House late that evening and went to a fraternity house. Doe was not allowed into the fraternity house, however, so he left and walked to Slices, an off-campus pizza parlor in Hamilton Village.

60.     As Doe was walking, he discarded an empty beer can into the road. A police officer saw Doe drop the can and issued him a citation at 1:17 a.m.

61.     While at Slices, Doe saw Jane Roe, a member of the Colgate Women's Crew Team, but they did not talk to each other.

62.     Doe then went to Frank Dining Hall on Colgate's campus for a late-night snack. Doe's University card activity shows he made a purchase in the dining hall at 1:50 a.m.

63.     When Doe got to the dining hall he noticed Roe sitting by herself, so he sat with her. The two ate together.

64.     When Doe got up to leave, Roe asked him where he was going. Doe said he was going back to his room. Roe joined him, although Doe did not ask her to.

65.     Doe and Roe entered Doe's residence hall together at 2:03 a.m.

66.     Once they got to Doe's room, Roe went immediately to Doe's bed. Doe and Roe began engaging in consensual foreplay. Both removed their shirts.

67.     Roe told Doe that if he could take her bra off, she would have sex with him. Doe took Roe's bra off and they had sexual intercourse, during which they changed positions. Roe

did not indicate to Doe, either verbally or physically, that she wanted to discontinue the sexual encounter.

68.     Some time after the first episode of intercourse, Roe told Doe that if he could name one Donald Trump policy with which he agreed, she would again have sex with him a second time. Doe named one such policy, and the two again engaged in sexual intercourse. Just as before, Roe did not indicate to Doe, either verbally or physically, that she wanted to discontinue the sexual encounter.

69.     Doe and Roe then fell asleep together in Doe's bed.

70.     At approximately 4:30 a.m., Doe woke up when he felt Roe's hand brush his penis. Doe interpreted this, as well as the position of Roe's body, as a sign that Roe wanted to again engage in sexual intercourse. Doe thus proceeded to have sex with Roe for a third time.

71.     During this third act of intercourse, Doe and Roe changed positions, and Doe heard Roe express verbal pleasure. Roe did not indicate to Doe, either verbally or physically, that she wanted to discontinue the sexual encounter.

72.     Doe and Roe fell asleep again after the encounter.

73.     Roe awoke around 6:00 a.m., asked Doe what time it was, and left his room shortly thereafter.

74.     According to University gate card records, Roe re-entered her residence hall at 6:12 a.m.

75.     At some point shortly thereafter, on information and belief, Roe learned that Doe had disclosed their sexual encounter to his friends, and that it was a topic of discussion amongst them in part because Roe had also had a sexual encounter with Doe's roommate, who was also a member of the Colgate Men's Crew Team.

76.    On further information and belief, Roe became embarrassed by the fact that other students were aware that she had had sexual encounters with at least two men on the Crew Team, and she began to feel uncomfortable attending events at which the Men's Crew Team was present.

**Roe Reports to Her Friends That Doe Had Sexual Intercourse With Her While She Was Asleep**

77.    On information and belief, Roe's increasing embarrassment and discomfort around other students' knowledge of her encounters with two separate men on the Crew Team, and her annoyance with Doe in particular for disclosing their encounter to others, led her to fabricate a narrative in which Doe initiated sex with her while she was still asleep, thereby minimizing her own level of participation in the encounter.

78.    Specifically, in or around mid-November, 2016, Roe told a fellow Women's Crew Team member, GB, that she had gotten drunk, gone to Doe's room, "made out" with him, and then fallen asleep. Doe told GB that she woke up to Doe having sex with her.

79.    Roe similarly reported, to several other friends, that Doe had sex with her while she was asleep.

80.    On information and belief, Roe did not tell any of her friends that she had *twice* had sexual intercourse with Doe prior to allegedly waking up to him penetrating her on the morning of October 30, 2016.

81.    GB told Roe this was a "problem" and identified it to Roe as a "sexual assault."

82.    GB then immediately approached individuals on the Colgate Men's Crew Team and falsely reported to them that Doe sexually assaulted Roe.

83.    As a direct result of GB's conversation with members of the Men's Crew Team, Doe was banned from all Crew Team social events as of mid-November of 2016.

84.     No one from the Crew Team consulted Doe or in any way attempted to ascertain the validity of GB's assertions before instituting this ban.

85.     The Handbook prohibits the conduct in which GB engaged. Specifically, it prohibits "hazing," which the Handbook defines as "any action or situation that recklessly or intentionally endangers mental or physical health, or creates substantial embarrassment, harassment or ridicule,  . . . in the course of initiation or continuing affiliation with an organization," including "[p]articipation in or creation of situations that cause physical harm or emotional strain, such as causing a member or non-member to be the object of malicious amusement or ridicule."

86.     Colgate was aware that GB, a member of the Colgate Women's Crew Team, intentionally subjected Doe, a member of the Colgate Men's Crew Team, to embarrassment and ridicule by informing the Men's Crew Team that Doe was a "rapist," thereby causing them to ban Doe from Crew Team social events and otherwise disassociate themselves from Doe in a manner that caused him substantial emotional distress.

87.     On further information and belief, although Colgate was aware of this hazing, it took no steps to protect Doe or discipline the responsible students.

**Roe Files a Report With Valerie Brogan at the Campus Safety Department**

88.     On February 26, 2017, Roe e-mailed Marilyn Rugg, Associate Provost for Equity and Diversity ("Associate Provost Rugg" or "Rugg"), and informed Rugg that she wished to file a formal report of sexual misconduct.

89.     Rugg forwarded Roe's e-mail to Valerie Brogan ("Brogan"), Assistant Director of Investigations at the Colgate Campus Safety Department, so that Brogan could schedule a meeting with Roe.

90.     Brogan met with Roe on February 28, 2017.

91.     Roe reported to Brogan that she had been drinking on the night of October 29, 2016, and was "somewhat intoxicated."

92.     Roe told Brogan that she met up with some members of the Men's Crew Team, including John Doe, at a fraternity party, and that they all left the party together to go to Slices. According to Roe, she and Doe "were friends but not super close."

93.     Roe told Brogan that Doe was upset because he had gotten a ticket for littering "earlier in the evening."

94.     Roe said she then left Slices and went to Frank Dining Hall with Doe.

95.     At Frank, said Roe, Doe was "flirting" with her and feeding her chicken nuggets. Roe told Brogan that although she did not want to "hook up" with Doe, Doe told Roe he thought they were going back to his room, and Roe thought they were going to watch a movie.

96.     Roe did not explain to Brogan how she came to be in Doe's room, but said that once she was there, Doe pushed her onto the bed.

97.     Roe said she felt "disoriented" at the time and had to lie down, and that Doe retrieved his computer so they could watch a movie.

98.     Then, Roe told Brogan, Doe started kissing Roe and taking his clothing off. Roe said she was "super disoriented and did not know what to do."

99.     Roe said she told Doe she was "not in the mood," but that he continued kissing her and digitally penetrated her. According to Roe, she "gave [Doe] excuses for not wanting have sex," but "everything [Doe] said was really aggressive" and Roe "started to get scared, and shut down."

100.    Roe then told Brogan that Doe had sex with her and was "holding [her] down." She did not explain to Brogan how it was that they began having sex.

101.    Roe further told Brogan that she "assumed that she'd fallen asleep and hadn't passed out," but that she woke up around 4:00 a.m. because Doe was penetrating her. Roe said she asked Doe what was happening, and he told her she had pushed him off the bed.

102.    Roe told Brogan that she told Doe she did not want to have sex but that Doe "kept laughing." Roe said she tried to push Doe off of her, tried to squirm away but could not because Doe's hands were on her hips, and explicitly told Doe "no."

103.    Roe also told Brogan that she was "disoriented" when she woke up with Doe on top of her "and thought that if she didn't make any noise/breathe he would think I died and finish, but he didn't."

104.    Roe told Brogan that when Doe "finished," he turned on the lights and rushed Doe out of the room.

105.    Roe said she arrived back at her room sometime between 4:30 and 4:45 a.m.

106.    After Roe recounted her version of events to Brogan, she asked Brogan for clarification as to what would happen if she wished to proceed with both the EGP process and a criminal investigation. Brogan informed Roe that the University "generally wait[s] until the criminal investigation is concluded before initiating [their] own investigation."

**Roe Decides to Initiate the Criminal Process**

107.    On March 3, 2017, Roe contacted Brogan and advised her that she had decided to "go through with the criminal process." Roe asked Brogan to put her in touch with the police.

*Roe's Statement to the Campus Sexual Assault Victims Unit*

108.   Brogan then contacted Investigator Dennis Dougherty ("Investigator Dougherty" or "Dougherty"), a member of the New York State Police Department's Campus Sexual Assault Victim's Unit.

109.   The Campus Sexual Assault Victims Unit was created in 2015 as part of "Enough is Enough." New York gave the State Police $4.5 million to create the sexual assault victims unit. Pursuant to state law, the unit provides assistance and training to campus police in sexual assault-related matters. *Id.*

110.   Brogan coordinated a meeting between Investigator Dougherty and Roe, and advised Associate Provost Rugg and Kimberly Taylor, Associate Dean for Conduct and Advising ("Dean Taylor" or "Taylor")), that Roe was pursuing a criminal complaint.

111.   Roe met with Investigator Dougherty on March 7, 2017.

112.   Roe repeated her version of events to Dougherty, although there were a number of things in her account to Dougherty that differed materially from her account to Brogan. For example, without limitation:

- Roe said she ran into Doe at Slices but could not remember if he was at the fraternity party. (Roe previously told Brogan she met up with some friends, including Doe, at the fraternity party.)

- Roe said she knew Doe "through the Crew Team" but they "were not friends." (Roe previously told Brogan she and Doe "were friends but not super close.")

- Roe said that when she got to Doe's room she "was sitting on his bed," and asked Doe if they could watch a movie, but Doe declined because he did not want to go out to the common room where the TV was located. (Roe previously told Brogan that Doe "pushed her up on the bed," that she was "disoriented and thought she should lie down," and that Doe then "got the computer for watching a movie".)

- Roe said Doe "started to pull my clothes off." (Roe previously told Brogan that Doe started taking his own clothes off.)

113.   Roe also gave details to Investigator Dougherty that were later directly contradicted by objective evidence, including:

- Roe's assertion that she accompanied Doe back to his room at 12:30 or 1 a.m. (In fact, Doe was issued a citation by police at 1:17 a.m., and University gate card records show that Doe did not swipe his gate card to get into his residence until 2:03 a.m.)

- Roe's assertion that Doe "didn't get anything to eat" at Frank Dining Hall, which Roe "found . . . to be strange because on the way back to campus he was talking about how hungry he was." (In fact, Doe's University card records confirm he did get something to eat, just as he consistently told the police and Colgate officials).

- Roe's assertion that she looked at her phone when she left Doe's room and went back to her room, and that it was 4:30 a.m. (In fact, University gate card records show Roe returning to her residence hall at 6:12 a.m., consistent with Doe's account.)

114.   Moreover, Roe did not tell either Brogan or Dougherty – much like she did not tell any of her friends – that she and Doe had actually had sexual intercourse *twice* prior to falling asleep.

115.   Instead, Roe first told Brogan that she "assumed" she fell asleep after the first act of intercourse. Then she claimed, when she met with Dougherty, that she could not "remember what happened" after the first act of intercourse.

### *The Pretext Call*

116.   On March 22, 2017, Roe, with the assistance of Investigator Dougherty, placed a "pretext call" to Doe from the Colgate campus.

117.   A "pretext phone call" – also variously known as a "controlled call," a "confrontational call," a "pretense call," "taping," and/or "consensual taping" – is, at its simplest, a recorded telephone call between an alleged victim and an alleged perpetrator. It is an

investigative tool that is often used by law enforcement personnel in cases of alleged sexual assaults. The call is initiated by the alleged victim, under the supervision of a law enforcement officer, for the purpose of soliciting incriminating statements from the alleged perpetrator.

118.    During the call, Roe attempted to get Doe to admit that he had sexually assaulted her. Doe was at all times unaware that he was being recorded.

### *Investigator Dougherty Interrogates Doe, on Colgate's Campus, While Doe is Under Duress*

119.    On March 23, 2017, Investigator Dougherty contacted Brogan and asked to use an office at the Colgate Campus Safety Department in order to question Doe.

120.    On information and belief, Brogan was aware that Dougherty intended to use this office to arrest and interrogate Doe.

121.    Brogan arranged for Dougherty to use a Colgate Campus Safety Department conference room.

122.    Neither Investigator Dougherty nor Brogan, nor anyone else from Colgate, made any effort to give Doe access to his parents, a lawyer, or any other adult advisor, despite the fact that Dougherty and Brogan were aware Doe was being investigated for sexual assault, a felony criminal offense carrying serious penalties. Likewise, no one informed Doe that he might be charged with a criminal offense.

123.    Doe met with Investigator Dougherty at the Colgate Campus Safety Department on March 23. He was not accompanied by a lawyer, parent, or any other advisor.

124.    At approximately 3:30 pm., Investigator Dougherty contacted Brogan and informed her that Doe was "in an emotional state" and wondered what she could do. Brogan contacted the Colgate Counseling Center, which dispatched a counselor to Campus Safety.

125.     Even though Investigator Dougherty understood that Doe – a college freshman with no previous involvement with the criminal justice system – was in a highly "emotional state," and even though Dougherty had gone so far as to contact Campus Safety for assistance with Doe's "emotional state," Dougherty nevertheless saw fit to relentlessly interrogate Doe and intimidate him into making a recorded statement concerning his interactions with Roe.

126.     Investigator Dougherty advised Doe of his *Miranda* rights. Doe acknowledged these rights and wrote his initials next to each in acknowledgment.

127.     Notably, Doe did *not* put his initials next to the following: "I fully understand these rights and at this time, I agree to give up my rights and make the following statement."

128.     Nonetheless, pressured by Dougherty, Doe did in fact participate in making a written statement about the events in question.

129.     The statement was not entirely in Doe's own words, however. It was a combination of his words and words suggested to him by Investigatory Dougherty, with which Doe felt extreme pressure to agree.

130.     In order to extract this statement from Doe, Investigator Dougherty played on Doe's fragile emotional state and questioned Doe's manhood, his relationship with God, and his family's love for him. Doe felt completely overwhelmed, and gave a statement in order to end the interrogation.

131.     In his statement, Doe was consistent and clear in his belief that, at the time the events occurred, he had consent from Roe for all of the sexual acts in which they participated.

132.     Concerning the third time they had sexual intercourse, Doe said his "perception at the time was that she was awake and wanted to have sex," and that he heard her saying "Ohhh,"

which to him signaled that she was enjoying the encounter. According to Doe, "[a]t the time when this happened I thought that what I was doing was okay[.]"

133.    Not satisfied that Doe was maintaining his innocence, Investigator Dougherty – using intimidating, threatening and coercive interrogation techniques on an emotional 19-year-old boy – pressed Doe to reconsider his view of the events and to agree with Dougherty's suggestions concerning how Doe should *now* view the encounter with Roe.

134.    For example, Dougherty pressured Doe to agree that there was a "possibility" Roe was actually asleep when they started having sex and that it was "possible" Roe was saying "no" rather than "oh." Dougherty also pressured Doe to agree with Dougherty that there was at least a "grey area" concerning his actions with Roe on the night in question. These words and concepts, which appear in Doe's statement from March 23, 2017, were Dougherty's; they were not independent thoughts initiated by Doe.

135.    This police coercion and intimidation of Doe, a Colgate freshman, occurred on Colgate's campus, in cooperation with Colgate, and with the express and/or implied consent of Colgate officials, including but not limited to Brogan.

136.    The "start time" of Doe's written statement is 3:24 p.m., and the "end time" is 4:18 p.m.

137.    Just six minutes after Doe began giving the statement, Dougherty contacted Defendant Brogan concerning Doe's fragile emotional state. Dougherty then continued interrogating Doe and pressuring him to agree with Dougherty's own view of the case for another 48 minutes, all with Colgate's knowledge and express or implied consent.

138.    In fact, Doe's emotional state was so tenuous that Investigator Dougherty decided not to arrest Doe that day, as he had originally planned to do.

**Roe Files a Formal Complaint Against Doe Under Colgate's Equity Grievance Policy**

139.    On March 27, 2017, Brogan met with Roe. Roe informed Brogan that she and Investigator Dougherty had placed a telephone call to Doe "about the night in question," and that Dougherty had met with Doe sometime after the telephone call. Roe also told Brogan that she believed Doe was going to be arrested either that day or the following.

140.    Brogan was, of course, already aware of the meeting between Dougherty and Doe, having helped facilitate it.

141.    Likewise, on information and belief, Brogan was already aware – due to her cooperative role with the NYS Campus Sexual Assault Victims Unit – that Dougherty and Roe placed a pretext call to Doe.

142.    Roe contacted Brogan following their March 27 meeting and requested that Colgate issue a no-contact order to Doe. Brogan thereafter contacted Dean Taylor, who issued the no-contact order on March 28, 2017.

143.    Notably, after the no-contact order issued, Roe freely and voluntarily went to the room right next to Doe's at least twice in order to socialize with her friends.

144.    On or about March 28, 2017, Roe contacted Brogan and advised Brogan that she wanted to proceed with a formal complaint against Doe under Colgate's Equity Grievance policies and procedures. Brogan passed along Roe's request to Rugg and Taylor.

145.    Doe was arrested on March 28, 2017. On information and belief, the arrest was the result of a coordinated effort between Investigator Dougherty, of the NYS Campus Sexual Assault Victims Unit, and Defendants, including but not limited to Brogan.

146.    The criminal case against Doe has since been resolved. Doe was not convicted and did not admit responsibility to the charges.

24

**The Investigation**

147.    On April 6, 2017, Associate Provost Rugg notified Doe of the EGP Investigation.

148.    Rugg appointed Brogan to act as the investigator.

149.    Prior to assuming her role at Colgate as Assistant Director of Investigations, Brogan had a long career in law enforcement, beginning in 1988 and ending with her retirement in 2012. Most recently, before joining the University's Campus Safety Department, Brogan was a detective with the Onondaga County Sheriff's Office Abused Persons Unit ("APU"), where she was responsible for investigating, among other things, alleged sexual offenses.

150.    As the person directly responsible for cooperating with Investigator Dougherty and coordinating Dougherty's coercive and intimidating interrogation of Doe – which occurred while both Dougherty and Brogan were aware that Doe was under extreme emotional duress – Brogan had an inherent conflict of interest and was not in a position to conduct the impartial investigation promised to Doe by Colgate's policies and procedures.

151.    Thus, it was a violation of Colgate's Handbook to appoint Brogan to investigate Roe's allegations against Doe.

*Flaws, Biases, and Due Process Violations in the Investigative Process*

152.    Brogan began interviewing witnesses on April 11, 2017. Between April 11 and April 28, she interviewed nine students, only two of whom – Doe and Roe – were eyewitnesses to the incident in question.

153.    Brogan was already familiar with Roe's account, having heard it when Roe first reported the incident to her on February 28, 2017, and having, on information and belief, received a copy of Roe's statement to Investigator Dougherty.

154.    When Brogan met with Roe again on April 21, 2017, she did so for the very limited purpose of reviewing the statement Roe had previously provided to Brogan and "determin[ing] if there was additional information that [Roe] believed wasn't captured in her statement or if there was new information she wished to share."

155.    Brogan did not question Roe, at the meeting, about the inconsistencies between the account Roe gave Brogan on February 28, 2017, and the account Roe gave Dougherty on March 7, 2017.

156.    Roe provided Brogan a few additional details at the April 21 meeting, but still did not tell Brogan that she and Doe had actually had sexual intercourse *twice* before falling asleep together in Doe's bed.

157.    Roe did, however, add that Doe was allegedly "verbally aggressive" during sex, but the only example she gave of this alleged "aggression" was that Doe was "saying her name and was moaning over and over."

158.    Brogan also interviewed Doe on April 21, 2017, approximately an hour and a half after her meeting with Roe ended.

159.    At the time of Doe's interview, Brogan was aware that, at the direction and under the supervision of Investigator Dougherty, Roe placed a pretext phone call to Doe on March 22, 2017; and that Dougherty interviewed Doe, on Colgate's campus, on March 23, 2017, and obtained a statement from Doe while he was under psychological duress.

160.    On information and belief, due to the cooperative relationship and coordinated effort between the NYS Police Campus Sexual Assault Victims Unit and Colgate's Campus Safety Department, Brogan already had in her possession, when she interviewed Doe, copies of the pretext phone call and Doe's statement to Investigator Dougherty.

161.     However, during her interview with Doe on April 21, Brogan feigned ignorance as to whether or not the pretext call had been recorded. Brogan even went so far as to falsely document, in her interview summary, that "at the time of this meeting, I was not aware of whether it was or wasn't" recorded.

162.     On information and belief, as a former law enforcement officer with a quarter of a century's experience in the profession and, specifically, lengthy experience in the field of sexual assault investigations, Brogan was at all relevant times aware that pretext phone calls are, by definition, *recorded* phone calls, and that the call between Roe and Doe on March 22, 2017 was, consistent with this well-known practice, recorded.

163.     Indeed, as set forth above, Roe had already discussed the recorded call with Brogan on March 27, 2017. Although Brogan documented that Roe allegedly said she did not know if the call was recorded, Roe later wrote that during the call she "held a microphone to [her] mouth and there was a wire connected to my phone, to record what was being said on the other end of the phone[.]" Roe's own statement thus belies any claim that she was unaware the call was recorded and, similarly, any claim by Brogan that both she and Roe were somehow in the dark about the nature of the call.

164.     Brogan purposefully and maliciously misrepresented to Doe her knowledge as to whether or not the call was recorded in an effort to obfuscate and otherwise withhold critical evidence from him (evidence that would later be used against him at the EGP Hearing).

165.     Brogan also attempted to meet with and otherwise contact Doe outside the presence of his attorney, even though she was aware at all relevant times that he was represented by counsel.

166.    On information and belief, Brogan did so in order to manipulate Doe, a 19-year-old with no prior experience with the Equity Grievance proceedings, into agreeing with Brogan's summary of her interview with Doe in which she affirmatively misrepresented Doe's statements concerning how he knew he had consent from Roe.

167.    Brogan also failed to follow the most basic investigatory methods and procedures to ensure she was gathering relevant and credible information during the course of her investigation.

168.    For example, even though Doe gave a completely different account of the incident during his interview than Roe had given during hers, Brogan – in contravention of the most basic investigatory methods and protocols – *never again interviewed Roe* to ask her to respond to Doe's version of events in any manner, or even to confirm the number of times Doe and Roe had actually engaged in sexual intercourse on October 30, 2016.

169.    Likewise, Brogan never confronted Roe about internal inconsistencies in her own accounts, or inconsistencies between Roe's accounts and the available objective evidence (evidence which Brogan herself obtained).

170.    This was because, on information and belief, Brogan's sole focus was to portray Doe, a male student accused of sexual misconduct, in as negative a light as possible and to bolster the credibility of Roe, the female complainant, even in the face of the wildly conflicting versions proffered by Roe and Doe and inconsistencies in Roe's own accounts.

171.    This was also because, as mandated by both OCR and Art. 129-B, Brogan and others involved in the administration of the EGP process are trained in so-called "trauma-informed interviewing and investigations," which OCR has openly and specifically linked to the protection of "girls and women."

*See* https://www.nasmhpd.org/sites/default/files/FedPartnersOCR.pdf.

### *The Trauma-Informed Approach is Inherently Biased and Scientifically Inaccurate*

172.    The trauma-informed approach includes several components: 1) understanding the impact of trauma on a neurological, physical, and emotional level; 2) promoting safety and support; 3) knowing positive ways to respond that avoid retraumatization; and 4) providing choice with a goal of empowerment. *See*, *e.g.*, *The 7 Deadly Sins of Title IX Investigations*, The 2016 ATIXA Whitepaper (available at https://atixa.org/wordpress/wp-content/uploads/2012/01/7-Deadly-Sins_Short_with-Teaser_Reduced-Size.pdf).

173.    According to a website affiliated with trauma-informed "expert" Claire K. Hall, J.D., who offers just one of dozens of trauma-informed training courses across the country, "Trauma-informed investigations have been shown to significantly strengthen a victim's account of incidents, to create a more supportive environment and to result in a greater likelihood of holding responsible offenders accountable[.]" *See* https://www.paper-clip.com/Main/Product-Catalog/TraumaInformed-Sexual-Assault-Investigations-Train-2918.aspx.

174.    A central tenet of trauma-informed training is the purported "neurobiological change" that occurs during a sexual trauma wherein the body releases a flood of chemicals that allegedly directly affect the individual's actions during the event as well as her memory of the event.

175.    According to proponents of the trauma-informed approach, "the stress associated with trauma makes it nearly impossible for the brain to accurately recall all the details of a sexual assault." *Trauma-Informed Sexual Assault Investigations Training Binder*, 2016 (available at https://www.trauma-informed-investigations.com/sites/trauma-informed-investigations.com/files/Trauma-Informed-Training-Samples.pdf).

176.    Thus, investigators are taught in trauma-informed trainings that inconsistencies in a complainant's story are a direct result of the trauma. Similarly, they are trained to view those inconsistencies as a natural byproduct of sexual assault as opposed to an indicator that the complainant's story may lack credibility.

177.    On information and belief, and consistent with federal and state requirements, Brogan and others involved in the EGP process at Colgate University received training consistent with the aforementioned principles, and applied these principles to the investigation and adjudication of Roe's complaint against Doe.

178.    Indeed, when Brogan met with Roe, Brogan told Roe something to the effect that "because of the traumatic nature of such events, more details come up throughout time," thus allowing Roe to explain away her shifting and evolving version of events as a side-effect of sexual trauma, rather than as a credibility issue.

179.    The problem with this government-mandated and government-sanctioned approach – which is designed specifically to protect female complainants and to bolster the credibility of their allegations of sexual violence – is that it lacks any solid scientific support. *See* Emily Yoffe, *The Bad Science Behind Campus Response to Sexual Assault*, The Atlantic, September 8, 2017 (available online at https://www.theatlantic.com/education/archive/2017/09/the-bad-science-behind-campus-response-to-sexual-assault/539211/).

180.    For example, and directly relevant here, "'[n]euroscience research does not support [the] claim that high levels of stress hormones impair memory for traumatic experience.' In fact, it's almost the opposite: 'Extreme stress *enhances* memory for the central aspects of an overwhelming 'emotional experience.'" *Id.*

181.   Colgate's use of the trauma-informed approach in this matter was, therefore, yet another factor that contributed to the overwhelmingly biased and unreliable Equity Grievance process.

**New York State Comprehensive Compliance Review**

182.   In the midst of the investigation into Roe's allegations against Doe, on May 17, 2017, New York State Governor Andrew Cuomo "ordered a comprehensive review of compliance under the 'Enough Is Enough' law at all higher-education institutions across the state." *Governor Cuomo Orders Comprehensive Statewide Review of Compliance With "Enough is Enough" Law to Protect Students From Sexual Assault on College Campuses*, May 17, 2017 (available at   https://www.governor.ny.gov/news/governor-cuomo-orders-comprehensive-statewide-review-compliance-enough-enough-law-protect.)

183.   According to Governor Cuomo, the purpose of the statewide inspection was to "ensure that all colleges and universities are fulfilling their obligations under the law to protect students from sexual assault, dating violence, domestic violence and stalking, and are taking every measure to properly investigate allegations of sexual assault on campus." *Governor Cuomo Orders Comprehensive Statewide Review of Compliance With "Enough is Enough" Law to Protect Students From Sexual Assault on College Campuses*, May 17, 2017 (available at https://www.governor.ny.gov/news/governor-cuomo-orders-comprehensive-statewide-review-compliance-enough-enough-law-protect.)

184.   Colgate, like all other New York State higher education institutions, was thus under immense pressure to prove that it was complying with Art. 129-B and that it was putting into practice the underlying purpose of the law: protecting female victims and holding accountable male perpetrators of sexual violence.

185.    On information and belief, Brogan concluded her investigation in early May. She did not generate an investigative report, and Doe was not allowed to respond to any of the summaries Brogan had prepared of the witnesses' statements prior to the EGP Hearing.

186.    When Doe reviewed the interview summaries, he learned, for the first time, that GB had directly and maliciously caused members of the Men's Crew Team to disassociate themselves with Doe and to otherwise ostracize him from his community.

187.    On May 24, 2017, Doe informed Dean Taylor that he believed GB's actions violated the University's hazing policies.

188.    Dean Taylor said she would "look into it." On information and belief, Dean Taylor took no further action on Doe's hazing complaint.

### **The Hearing**

189.    On May 31, 2017, an Equity Grievance Hearing Panel ("the Panel") convened to consider Roe's allegations against Doe ("the Hearing").

190.    Specifically, the Panel considered whether, on the night of October 30, 2016, Doe:

- Kissed Roe without her consent ("Charge 1");

- Removed Roe's clothing without her consent ("Charge 2");

- Digitally penetrated Roe without her consent ("Charge 3"); and

- Had sexual intercourse with Roe without her consent ("Charge 4").

191.    The Panel considered testimony from Doe and Roe, as well as testimony from Brogan in which Brogan summarized her interviews with the other witnesses.

192.    Consequently, Doe had no opportunity to confront or ask questions of the witnesses, and the Panel had no opportunity to assess the witnesses' credibility.

193.    Moreover, the Panel, with approval from the Chair, considered evidence of Doe's allegedly "aggressive" behavior towards female students other than Roe, but refused to consider evidence of Roe's prior interactions with other men.

194.    In so doing, the Panel applied different evidentiary standards to Doe, the male respondent, than Roe, the female complainant.

195.    The decision to allow evidence of Doe's allegedly "aggressive" behavior also violated Colgate's Handbook, which generally prohibits the introduction and consideration of "incidents not directly related to the violation" unless those incidents "show a pattern." Here, there was no such pattern.

196.    The Panel also considered the recorded pretext call and the written statement Doe gave on March 23, 2017, at the direction of and under interrogation by Investigator Dougherty.

197.    Doe maintained at the Hearing, as he had throughout the process, that all of his sexual contact with Roe was consensual; that she had twice invited him to perform some feat (removing her bra, naming a Trump administration policy with which he agreed) in order to have sex with her; and that she had been a willing participant in the third act of sexual intercourse, including changing positions and expressing verbal pleasure.

198.    At the Hearing, Roe admitted, for the first time, that she had engaged in three acts of intercourse with Doe, and that during the third act of intercourse, Doe "asked me to get on top and I did."

199.    Doe received the Panel's decision on June 6, 2017. The Panel found Doe not responsible for Charges 1 and 2 in light of Doe and Roe's "contrary accounts" of each event and the Panel's resulting inability to find, by a preponderance of evidence, that the acts occurred without Roe's consent.

200.    The Panel also found Doe not responsible for Charge 3 because, at the Hearing, Roe was unable "to state conclusively" that she did not tell Doe he could "have sex" with her if he could remove her bra and/or name a Trump administration policy with which he agreed, and because "have sex" could reasonably be interpreted to include digital penetration.

201.    As to Charge 4, however, the Panel found Doe responsible for non-consensual sexual intercourse. Specifically, it found that Roe was asleep and unable to consent to the third act of intercourse on the morning of October 30, 2016.

202.    This finding was not supported by a preponderance of available, credible evidence.

203.    For example, but without limitation:

- The Panel accepted Doe's account that he and Roe had sexual intercourse *three times* in the span of four hours, yet made no mention of the fact that Roe conveniently omitted this detail *every time* she reported the alleged "assault" to her friends, Investigator Dougherty, and Brogan.

- The Panel could *not* find that the first two instances of sexual intercourse were non-consensual. In other words, the Panel could not be sure Roe was telling the truth about at least one of those acts of intercourse (and, indeed, had not even reported the other).

- Roe admitted, at the Hearing, that during the third and final time she and Doe had intercourse, she did in fact get on top of Doe in response to his inquiry as to whether she wanted to do so. Thus, even if Roe had been asleep when the intercourse began, she admitted to being a willing participant who clearly affirmatively consented to sexual intercourse by actively engaging in it. This admission was also directly at odds with Roe's claim that Doe was restraining her and that she "played dead" during the third act of intercourse so that Doe would just "finish" and the encounter would end.

- The objective evidence supported Doe's assertion that Roe did not leave his room until 6 a.m., when she woke up after having again fallen asleep after the third and final time she and Doe had sexual intercourse. That same evidence refuted Roe's assertion that Doe kicked her out of his room at 4:30 a.m.

204.    On information and belief, the Panel found Doe responsible for Charge 4 not because the preponderance of evidence supported such a finding (it did not), but for at least two reasons unrelated to the actual evidence: <u>first</u>, the University's strong desire to hold men accused of sexual misconduct "accountable" and to punish them accordingly, especially now that Colgate was – like all schools in the state – under review for compliance with Art. 129-B; and <u>second</u>, the "trauma-informed" training the investigator and Panel members received, which erroneously encourages fact-finders to believe fragmented, incomplete, and disjointed stories on the basis that such stories are actually evidence of sexual trauma as opposed to evidence that a complainant is simply not telling the truth.

205.    In order to justify its erroneous finding, the Panel relied heavily on two highly tainted pieces of evidence.

206.    First, it relied on statements Doe made during the pretext phone call, a copy of which Colgate intentionally withheld from Doe.

207.    Second, it relied on Doe's March 23, 2017 statement to Investigator Dougherty, which was obtained through intimidation and coercion and while Doe was in a highly "emotional state" and under duress. By the Panel's own admission, this statement was central to its decision to hold Doe responsible for non-consensual sexual intercourse with Roe.

208.    Of course, the contents of Doe's statements did not actually support the Panel's finding that Doe was responsible for non-consensual sexual intercourse with Roe. At *most*, the statements established that Doe was willing to acknowledge – in both the call and the statement – that it was "*possible*" Roe was asleep when he initiated sexual intercourse on the morning of October 30, 2017.

209.    That Doe agreed with this "possibility" – suggested to him by Roe and Investigator Dougherty five months after the incident in question under extremely emotional conditions – does not amount of proof, by a preponderance of evidence, that Doe was in fact asleep. Nor does it negate the fact that, by Roe's own admission at the hearing, <u>Roe willingly and actively participated in and consented to the encounter thereafter</u>, as she had the prior two times she and Doe had sexual intercourse on the date in question.

210.    The Panel's finding was thus also at odds with the University's definition of consent.

211.    As to consent, Colgate's Equity Grievance Policy provides, in relevant part:

Sexual activity or contact must be based on mutual and affirmative consent to the specific activity or contact.

Affirmative consent is a knowing, voluntary, and mutual decision among all participants to engage in sexual activity. Consent can be given by words or actions, as long as those words or actions create clear permission regarding willingness to engage in the sexual activity.

[. . .]

The existence of consent is based on the totality of the circumstances, including the context in which the alleged incident occurred and any similar previous patterns that may be evidenced.

212.    Here, the "totality of the circumstances" makes clear that Roe willingly accompanied Doe to his room; willingly disrobed; willingly engaged in foreplay; willingly had intercourse with Doe (including by challenging him to perform certain tasks in exchange for sex); fell asleep in Doe's bed, with Doe; woke up and willingly had intercourse with Doe again (including by <u>affirmatively indicating her consent to continue the intercourse by willingly switching positions after Doe asked her if she wanted to do so</u>); went back to sleep; and left Doe's room of her own accord when she again awoke.

213.    Based on the erroneous finding that Doe was responsible for non-consensual sexual intercourse, the Panel assessed a sanction of expulsion.

214.    According to the Panel, expulsion was appropriate "in view of the nature of the conduct for which [Doe] [was] found responsible, the impact that [Doe's] actions have had on [Roe], and identical sanctions in other EGP cases involving nonconsensual sexual intercourse consisting of <u>penile vaginal penetration</u>." (Emphasis added.)

215.    Penile-vaginal penetration is not, of course, the only means by which non-consensual sexual intercourse can occur. As Colgate's Equity Grievance Policy notes:

> Sexual assault of this type includes the penetration, no matter how slight, of the vagina or anus with any body part or object, or oral penetration by a sex organ of another person, forcibly or without affirmative consent or where the victim is incapable of affirmative consent due to mental or physical incapacity.

216.    In assessing Doe's sanction, however, the Panel explicitly took into account just *one* form of non-consensual sexual intercourse: a man penetrating a woman.

217.    On information and belief, the Panel did *not* take into account sanctions in cases involving non-consensual sexual intercourse in which a *woman* is the responsible party, even though such sanctions are clearly relevant to ensuring uniformity in discipline for non-consensual sex.

218.    On further information and belief, the Panel does not routinely assess a sanction of expulsion in cases involving non-consensual sexual intercourse in which a woman is the responsible party. The sanction of expulsion is reserved for <u>penile</u> penetration. That is, it is reserved for men.

**The Appellate Process**

219.    On June 15, 2017, Doe submitted an appeal in which he raised multiple challenges to the finding and sanction. Roe did not appeal.

220.    An appellate panel granted Doe's appeal in part, on the basis that Doe was not given the opportunity to submit an impact statement to the Panel prior to the Panel's determination concerning sanction, but denied it in all other respects.

221.    Significantly, in response to Doe's argument on appeal that the Panel did not adequately consider Roe's admission that she had voluntarily gotten on top of him during the third act of intercourse, the appellate panel chastised Doe for failing to "identify the[] issue[] to the Hearing Panel" and "explain[] [his] contentions to the Hearing Panel in detail."

222.    This admonition impermissibly shifts the burden of proof to Doe; the Hearing Panel itself was responsible for exploring Roe's admission in more detail (a responsibility it utterly failed to carry out during the course of the Hearing).

223.    Doe submitted an impact statement, as well as letters from his family members, detailing the effects that Roe's false allegations had on his educational and social life, the damage done to him by Investigator Dougherty's coercive interrogation and the resulting criminal process, his fragile mental state, and his changed relationships with his family and friends.

224.    Doe's heartfelt submission was in vain, however. The Hearing Panel reconvened and assessed the same sanction – expulsion – for the same reasons it previously gave.

225.    Doe again appealed, this time challenging only the expulsion (his other appellate arguments having already been denied after his first appeal).

226.    A different appellate panel denied Doe's appeal, citing, with approval, the Hearing Panel's consideration of sanctions in other cases involving men penetrating women.

227.     On information and belief, the appellate panel – like the Hearing Panel – did not consider sanctions in cases involving non-consensual intercourse in which the responsible party was a *woman*.

228.     Doe's official Colgate transcript now bears the notation "Expelled after a finding of responsibility for a code of conduct violation."

229.     As a result of Defendants' unlawful actions, Doe has suffered immense losses. It will be enormously difficult for Doe to obtain a college degree from any four-year institution, let alone one comparable to Colgate, and similarly difficult to obtain any graduate degree. Because of the black mark on his transcript, he will forever have to explain to admissions personnel the reason for his expulsion.

230.     Doe has also experienced emotional, psychological, and physical distress as a result of the investigation process and his expulsion.

**AS AND FOR A FIRST CAUSE OF ACTION**
**Violation of Title IX of the Education Amendments of 1972, 20 U.S.C. § 1681 *et seq*.**
**Erroneous Outcome and Selective Enforcement**
**(Colgate University)**

231.     John Doe repeats and realleges each and every allegation hereinabove as if fully set forth herein.

232.     Title IX of the Education Amendments of 1972 provides, in relevant part, that: "No person in the United States shall, on the basis of sex, be excluded from participation in, be denied the benefits of, or be subjected to discrimination under any education program or activity receiving Federal financial assistance."

233.     Title IX of the Education Amendments of 1972 applies to all public and private educational institutions that receive federal funding, which includes Defendant Colgate.

234.   Title IX may be violated by a school's failure to prevent or remedy sexual harassment or sexual assault or by the imposition of university discipline where gender is a motivating factor in the decision to discipline.

235.   Both an "erroneous outcome" and an "unjustly severe penalty" occurred in this case.  John Doe was innocent and wrongly found to have committed a violation of Defendant Colgate's Equity Grievance policies and procedures, and gender bias was a motivating factor. In addition, Defendant Colgate imposed an unwarranted and excessive sanction on John Doe and gender bias was a motivating factor in assessing the sanction.

236.   Both the Department of Education and the Department of Justice have promulgated regulations under Title IX that require a school to "adopt and publish grievance procedures providing for the *prompt and equitable resolution* of student... complaints alleging any action which would be prohibited by" Title IX or regulations thereunder. 34 C.F.R. § 106.8(b) (Dep't of Education); 28 C.F.R. § 54.135(b) (Dep't of Justice) (*emphasis added*). Such prohibited actions include all forms of sexual harassment, including sexual intercourse, sexual assault, and rape.[3]

237.   The "prompt and equitable" procedures that a school must implement include, at a minimum:

- "Notice . . . of the procedure, including where complaints may be filed";

- "Application of the procedure to complaints alleging [sexual] harassment...";

- "Adequate, reliable, and impartial investigation of complaints, including the opportunity to present witnesses and other evidence";

- "Designated and reasonably prompt timeframes for the major stages of the complaint process"; and

---

[3] *See generally* U.S. Dep't of Education, Office for Civil Rights, *Revised Sexual Harassment Guidance: Harassment of Students by School Employees, Other Students, or Third Parties -- Title IX* (2001) at 19-20, 21 & nn.98-101.

- "Notice to the parties of the outcome of the complaint......"[4]

238.    Based on the foregoing, Defendants failed to conduct an adequate, reliable, and impartial investigation of the Roe complaint.

239.    Particular circumstances suggest that gender bias was a motivating factor behind the erroneous findings and the decision to impose an unjustly severe penalty upon John Doe. These circumstances include, *inter alia:*

    a.  Brogan conducted her investigation and used investigative techniques, including the so-called "trauma-informed approach," in a manner specifically designed to attempt to credit the female complainant's version of events and to discredit the male respondent's version of events.

    b.  Brogan likewise presented a skewed version of the facts when she accepted the female complainant's statements at face value despite the lack of corroboration for many of the complainant' assertions, and when she failed to challenge or thoroughly investigate the female complainant's statements in part because of the erroneous theory that women who have experienced sexual trauma commonly have incomplete memories of the events in question.

    c.  The Panel treated Doe, the male respondent, differently than Roe, the female complainant, including, without limitation, by considering evidence of Doe's previous interactions with women but refusing to consider Roe's previous interactions with men.

    d.  The Panel reached a final decision that was directly at odds with the preponderance of reliable and credible evidence it had before it, and at odds with Colgate's policies concerning affirmative consent. Specifically, but without limitation, even though Roe admitted to being an active participant in sexual intercourse, including willingly switching positions during the course of the act, the Panel found that Roe did not consent to the intercourse because she was allegedly asleep when it began. Thus, the only explanation for its determination that John Doe is responsible for non-consensual sexual intercourse is bias against John Doe, a male student.

---

[4] *Id.* at 20.

240.     Defendant also imposed an unjustly severe penalty on John Doe, and it did so on the basis of his gender.

241.     Specifically, the Panel imposed a sanction of expulsion on the explicit basis that the act involved a male penetrating a female with his penis. On information and belief, had John Doe been a woman found responsible for non-consensual sexual intercourse, Colgate would not have imposed a sanction of expulsion.

242.     This unlawful discrimination in violation of Title IX proximately caused John Doe to sustain substantial injury, damage, and loss, including, but not limited to: mental anguish; severe emotional distress; injury to reputation; past and future economic loss; deprivations of fair process; loss of educational opportunities; and loss of future employment prospects.

243.     As a result of the foregoing, John Doe is entitled to damages in an amount to be determined at trial, plus prejudgment interest, attorneys' fees, expenses, costs and disbursements.

**AS AND FOR A SECOND CAUSE OF ACTION**
**<u>Breach of Contract</u>**
**(Defendants Colgate University and Board of Trustees)**

244.     John Doe repeats and realleges each and every allegation hereinabove as if fully set forth herein.

245.     Doe applied to and enrolled in the University and paid associated fees and expenses. Doe did so in reliance on the understanding and with the reasonable expectation that the University would implement and enforce the provisions and policies set forth in its official publications, including the Student Handbook.

246.     An express contract or, alternatively, a contract implied in law or in fact was formed between Doe and the University.

247.    The contract contained an implied covenant of good faith and fair dealing. It implicitly guaranteed that any proceedings would be conducted with basic fairness.

248.    Based on the aforementioned facts and circumstances, Defendants breached express and/or implied agreement(s) with John Doe, and the covenant of good faith and fair dealing contained therein.

249.    Defendants committed several breaches of its agreements with John Doe during the investigation and hearing process. A non-exhaustive list of Defendants' breaches include the following:

**Defendants failed to protect John Doe from hazing and to discipline the responsible students**

250.    The Colgate Handbook prohibits "hazing," which the Handbook defines as "any action or situation that recklessly or intentionally endangers mental or physical health, or creates substantial embarrassment, harassment or ridicule,  . . . in the course of initiation or continuing affiliation with an organization," including "[p]articipation in or creation of situations that cause physical harm or emotional strain, such as causing a member or non-member to be the object of malicious amusement or ridicule."

251.    GB, in concert with members of the Colgate Men's Crew Team, engaged in "hazing" when they intentionally and unilaterally banned Doe from social events and otherwise ostracized him from the "Crew" community, thereby causing him embarrassment and emotional distress.

252.    Defendants were at all relevant times aware of the hazing and, in breach of their contract with Doe and the implied covenant of good faith and fair dealing contained therein, did nothing to protect John Doe or discipline the responsible student(s), even after Doe complained to Dean Taylor on May 24, 2017, about the hazing and its deleterious effects on him.

**Defendants Assigned Brogan to Conduct the Investigation in violation of the Handbook's Conflict of Interest Policy**

253.   Colgate's Handbook protects students from bias in the investigative process by promising to appoint an investigator who is free from any conflict of interest.

254.   In breach of this obligation, Defendants appointed Brogan to investigate Roe's complaint, even though Brogan initially received Roe's report; assisted Roe in obtaining a protective order against Doe; assisted the New York State Police in detaining and interrogating Doe on Colgate's campus, and otherwise colluded with the New York State Police to effectuate Doe's arrest and criminal prosecution.

255.   Thus, Defendants' decision to appoint Brogan as the investigator violated the Handbook and the covenant of good faith and fair dealing therein.

**Defendants admitted evidence of Doe's alleged "aggression," in violation of the Handbook.**

256.   Colgate's Handbook prohibits the introduction and consideration of "incidents not directly related to the violation" unless those incidents "show a pattern."

257.   Here, Defendants allowed the presentation of evidence that Doe was allegedly verbally "aggressive" with women other than Roe, even though there was no indication that any "pattern" of alleged aggression existed.

258.   Thus, the admission of the evidence violated the Handbook and the covenant of good faith and fair dealing therein.

**Defendants failed to properly apply the definition of consent, resulting in a finding directly at odds with the preponderance of available, credible, and uncontroverted evidence.**

259.   At the time the subject incident was adjudicated, the U.S. Department of Education Office of Civil Rights and Colgate's Equity Grievance policies and procedures required that a preponderance of the evidence standard be used to evaluate allegations of sexual

misconduct. OCR has subsequently issued guidance allowing for the use of a "clear and convincing evidence" standard.

260.    Defendants breached their agreement with John Doe, and the covenant of good faith and fair dealing contained therein, when they failed to apply the University's definition of consent in light of the preponderance of available, credible, and uncontroverted evidence.

261.    The Handbook provides:

> Sexual activity or contact must be based on mutual and affirmative consent to the specific activity or contact.
>
> Affirmative consent is a knowing, voluntary, and mutual decision among all participants to engage in sexual activity. Consent can be given by words or actions, as long as those words or actions create clear permission regarding willingness to engage in the sexual activity.
>
> [. . . ]
>
> The existence of consent is based on the totality of the circumstances, including the context in which the alleged incident occurred and any similar previous patterns that may be evidenced.

262.    Based on the foregoing, a fair reading of the preponderance of evidence reveals that Roe affirmatively indicated her consent to intercourse by willingly switching positions after Doe asked her if she wanted to do so.

263.    Defendants therefore breached their contract with John Doe, and the covenant of good faith and fair dealing contained therein, when they failed to utilize and apply the requisite preponderance of the evidence standard and the Handbook's definition of consent.

**Defendants imposed a disciplinary sanction without affording Doe due process**

264.    The Handbook provides:

> [T]he University recognizes the need to protect the inviolability of the student's personal and civil rights: specifically, the right to be secure in one's person, speech, living quarters, papers, and effects against unreasonable search and seizure; and **the freedom from disciplinary**

45

**sanction except by due process**, with avenues of recourse available when a student claims to have been subjected to prejudicious, discriminatory, or capricious treatment. (Emphasis added.)

265.    Defendants failed to provide Doe adequate due process protections at the Hearing, including, without limitation, the right to a fair and impartial tribunal and the right confront and cross-examine witnesses against him at the Hearing.

266.    As set forth above, the Hearing Panel was not impartial. For example, it treated Doe, a male, differently than Roe, a female, in terms of the evidence it was willing to consider against each; accepted selective hearsay and double-hearsay testimony from a biased witness (Brogan); and received training in a "trauma-informed" approach to Title IX disciplinary proceedings, the purpose of which is to bolster the claims of female accusers.

267.    Further, where credibility is at issue, as it was here, and where a student faces expulsion, as Doe did, the right to confront and cross-examine witnesses is of heightened importance.

268.    Defendants also impermissibly shifted the burden to Doe to prove his interactions with Roe were consensual, as evidenced by the appellate panel's admonition that Doe was apparently responsible for developing and expanding upon Roe's admission, at the Hearing, that she voluntarily switched positions during the third act of intercourse.

269.    The sanction resulting from these proceedings was thus imposed without due process, in breach of the Handbook and the covenant of good faith and fair dealing contained therein.

270.    As a direct and foreseeable consequence of the foregoing breaches, John Doe sustained damages, including, without limitation, loss of educational and career opportunities, economic injuries and other direct and consequential damages.

271.    John Doe is entitled to recover damages for Defendants' breaches of the express and/or implied contractual obligations described above in an amount to be determined at trial.

### AND AS FOR A THIRD CAUSE OF ACTION
### Breach of Contract/Common Law: Denial of Basic Fairness/
### Arbitrary and Capricious Decision Making
### (Defendants Colgate University and Board of Trustees)

272.    John Doe repeats and realleges each and every allegation hereinabove as if fully set forth herein.

273.    Defendants had a duty, either under an express or implied contract or as a matter of common law, to ensure that the proceedings against John Doe were conducted in good faith and with basic fairness.

274.    Defendants breached this duty of good faith and basic fairness by, without limitation:

- Failing to provide John Doe with the same protections explicitly afforded the complainant under Colgate's Handbook;

- Facilitating, condoning, and eventually using against Doe a coerced statement, extracted from Doe while Doe was under extreme psychological and emotional duress;

- Obfuscating material evidence – the recorded pretext call – by falsely claiming ignorance as to whether the call was recorded (and thus available for Doe to review);

- Attempting to contact Doe in the absence of his counsel for the purpose of manipulating Doe into agreeing to an inaccurate summary of his witness interview;

- Employing a method of investigation – the so-called "trauma-informed approach" – specifically designed to bolster the accounts of female accusers and rationalize their inconsistencies, to the detriment of the male accused;

- Failing to provide Doe the opportunity to be heard in front of a fair and impartial tribunal;

- Failing to provide John Doe the opportunity to confront and cross-examine witnesses at a fair hearing;

- Arbitrarily and capriciously finding that the complainant did not consent to intercourse, when the complainant herself admitted that she willingly switched positions during the intercourse, thereby indicating affirmative consent to engage in it;

- Impermissibly shifting the burden of proof to Doe to show consent (even where Roe admitted her affirmative consent to engage in the third act of intercourse); and

- Arbitrarily and capriciously expelling John Doe.

275.    Defendants' breach of the duty to ensure basic fairness proximately caused John Doe to sustain substantial injury, damage, and loss, including, but not limited to: mental anguish; severe emotional distress; injury to reputation; past and future economic loss; deprivations of due process; loss of educational opportunities; and loss of future career prospects.

276.    As a result of the foregoing, John Doe is entitled to damages in an amount to be determined at trial.

## AS AND FOR A FOURTH CAUSE OF ACTION
### Estoppel and Reliance
### (Defendants Colgate University and Board of Trustees)

277.    John Doe repeats and realleges each and every allegation hereinabove as if fully set forth herein.

278.    Colgate's various policies constitute representations and promises that Colgate should have reasonably expected to induce action or forbearance by John Doe.

279.    Colgate expected or should have expected John Doe to accept its offer of admission, incur tuition and fees expenses, and choose not to attend other colleges based on its express and implied promises that Colgate would not tolerate, and John Doe would not suffer,

discrimination or harassment by fellow students or faculty members and would not deny John

Doe his procedural rights should he be accused of a violation of Colgate's policies.

280.    John Doe relied to his detriment on these express and implied promises and

representations made by Colgate, by choosing to attend Colgate rather than other schools of

equal caliber and paying the required tuition and fees.

281.    As a direct and proximate result of the above conduct, John Doe sustained

damages, including, without limitation, loss of educational and career opportunities, economic

injuries and other direct and consequential damages.

282.    As a result of the foregoing, John Doe is entitled to damages in an amount to be

determined at trial.

**AS AND FOR A FIFTH CAUSE OF ACTION**
**Violation of New York State Human Rights Law**
**(Colgate University)**

283.    John Doe repeats and realleges each and every allegation hereinabove as if fully

set forth herein.

284.    Defendant Colgate is an education corporation organized and operating as such

under the laws of the State of New York.

285.    The New York State Human Rights Law § 296(4) provides "[i]t shall be an

unlawful discriminatory practice for an education corporation or association ... to permit the

harassment of any student or applicant, by reason of his race, color, religion, disability, national

origin, sexual orientation, military status, sex, age, or marital status[.]" N.Y. Exec. Law § 296(4).

286.    Colgate's Handbook states, in pertinent part:

> This policy prohibits acts of discrimination, harassment, sexual
> assault and sexual exploitation…[a]ny and all such acts are serious
> violations of our community values. This policy is a fundamental
> part of a Colgate community where all members can study, live,

49

and work together in a community characterized by equal opportunity, inclusiveness, safety and mutual respect.

Colgate fully subscribes to all federal and state civil rights law banning discrimination in private institutions of higher education. These include but are not limited to Title IX….Colgate is committed not only to compliance with these laws but with promoting a community that lives out the values these equal opportunity laws envision.

287.    Based on the foregoing, Colgate permitted discrimination against John Doe on the basis of his sex.

288.    Based on the foregoing, Colgate authorized, condoned and/or acquiesced to discriminatory conduct against John Doe.

289.    Based on the foregoing, Colgate knew or should have known of such discriminatory conduct and failed to undertake action to prevent it.

290.    Defendant Colgate engaged in the following discriminatory acts or practices against John Doe as the male accused: Colgate subjected John Doe to disciplinary action in an arbitrary and capricious way, and in discrimination against him on the basis of his gender; Colgate failed to adhere to its Handbook; the Decision was discriminatory in that, given the evidence (or lack thereof), the only possible way to reach the Decision was a discriminatory bias against males.

291.    Based on the foregoing facts and circumstances, Colgate engaged in unlawful discriminatory practices in violation of N.Y. Exec. Law § 296(4).

292.    As a direct and proximate result of the above conduct, John Doe sustained damages, including, without limitation, emotional distress, loss of educational and career opportunities, economic injuries and other direct and consequential damages.

293.   As a result of the foregoing, John Doe is entitled to damages in an amount to be determined at trial, plus prejudgment interest, attorneys' fees, expenses, costs and disbursements.

### PRAYER FOR RELIEF

**WHEREFORE,** for the foregoing reasons, John Doe demands judgment against Defendants as follows:

(i)   on the first cause of action for violation of Title IX of the Education Amendments of 1972, a judgment awarding John Doe damages in an amount to be determined at trial, including, without limitation, damages to physical well-being, emotional and psychological damages, damages to reputation, past and future economic losses, loss of educational and career opportunities, and loss of future career prospects, plus prejudgment interest, attorneys' fees, expenses, costs and disbursements;

(ii)   on the second cause of action for breach of contract, a judgment awarding John Doe damages in an amount to be determined at trial, including, without limitation, past and future economic losses, loss of educational and career opportunities, and loss of future career prospects;

(iii)   on the third cause of action for denial of basic fairness under contract and common law, a judgment awarding John Doe damages in an amount to be determined at trial, including, without limitation, damages to physical well-being, emotional and psychological damages, damages to reputation, past and future economic losses, loss of educational and career opportunities, and loss of future career prospects, plus prejudgment interest, attorneys' fees, expenses, costs and disbursements;

(iv)   on the fourth cause of action for estoppel and reliance, a judgment awarding John Doe damages in an amount to be determined at trial, including, without limitation, past

and future economic losses, loss of educational and career opportunities, and loss of future career prospects;

(v)     on the fifth cause of action under New York State Human Rights Law § 296(4), a judgment awarding John Doe damages in an amount to be determined at trial, including, without limitation, damages to physical well-being, emotional and psychological damages, damages to reputation, past and future economic losses, loss of educational opportunities, and loss of future career prospects, plus prejudgment interest, attorneys' fees, expenses, costs and disbursements;

(vi)     a declaratory judgment, pursuant to 28 U.S.C. § 2201, declaring that: (i) the outcome and findings made by Colgate should be reversed; (ii) Plaintiff's reputation should be restored; (iii) Plaintiff's disciplinary record be expunged; (iv) the record of Plaintiff's expulsion be removed from his education file; and (v) any record of the complaint against Plaintiff be permanently destroyed;

(vii)     an injunction directing Colgate to: (i) reverse the outcome and findings regarding Roe's complaint; (ii) expunge Plaintiff's disciplinary record; (iii) remove any record of Plaintiff's expulsion from his education file; and (iv) permanently destroy any record of Roe's complaint; and

(viii)     awarding John Doe such other and further relief as the Court deems just, equitable and proper.

## **JURY DEMAND**

John Doe herein demands a trial by jury of all triable issues in the present matter.

Dated:  New York, New York
        November 27, 2017

                                    Respectfully submitted,

                                    NESENOFF & MILTENBERG, LLP
                                    *Attorneys for Plaintiff*


                                    By:*/s/ Andrew T. Miltenberg*
                                    Andrew T. Miltenberg, Esq. (517014)
                                    Tara J. Davis, Esq. (519928)
                                    Stuart Bernstein, Esq. (520831)
                                    363 Seventh Avenue, Fifth Floor
                                    New York, New York 10001
                                    (212) 736-4500
                                    amiltenberg@nmllplaw.com
                                    tdavis@nmllplaw.com
                                    sbernstein@nmllplaw.com