UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF NEW YORK
-------------------------------------------------------------------X
JOHN DOE,

Civil Action No: 5:17-cv-1298 (FJS/ATB)

                  Plaintiff,

       -against-

COLGATE UNIVERSITY,

                Defendant.
-------------------------------------------------------------------X

**PLAINTIFF JOHN DOE'S MEMORANDUM OF LAW IN OPPOSITION TO
DEFENDANT COLGATE UNIVERSITY'S MOTION FOR SUMMARY JUDGMENT**

NESENOFF & MILTENBERG, LLP
*Attorneys for Plaintiff*

By:/s/ *Andrew T. Miltenberg*
   Andrew T. Miltenberg, Esq. (517014)
   Tara J. Davis, Esq. (519928)
   Nicholas E. Lewis, Esq. (700674)
   363 Seventh Avenue, Fifth Floor
   New York, New York 10001
   (212) 736-4500
   amiltenberg@nmllplaw.com
   tdavis@nmllplaw.com
   nlewis@nmllplaw.com

## **TABLE OF CONTENTS**

**Page**

TABLE OF AUTHORITIES ........................................................................ iii

PRELIMINARY STATEMENT ...................................................................1

FACTUAL BACKGROUND .......................................................................2

ARGUMENT ...............................................................................................5

    I. Legal Standards ....................................................................................5

        A. The Summary Judgment Standard ......................................................5

        B. Title IX ..............................................................................................5

        C. The Title VII Burden-Shifting Framework ...........................................6

    II. Title IX-Erroneous Outcome.................................................................7

        A. Plaintiff has sufficient evidence to cast articulable doubt on the accuracy of the outcome..........................................................................7

        B. Plaintiff has evidence of "particular circumstances suggesting that gender bias was a moving factor" in the University's disciplinary action against him ...............................................................................9

            i. Sex Discrimination/Gender Bias & Procedural Irregularities ......9

            ii. Enough is Enough and the Sins of Dougherty............................9

            iii. NY State Police Investigation Dougherty Joins the Campus Sexual Assault Victim's Unit: Irregular Investigations Ensue ............10

            iv. Colgate's Liability for Dougherty's Unfair Treatment of Doe.14

            v. Failure to investigate Roe for non-consensual sexual contact, while aggressively pursuing the same charge against Doe .................17

            vi. Failure to appoint a neutral investigator to investigate Doe's case ...............................................................................18

            vii. Colgate's improper reliance on the criminal case file .............20

viii. Consideration of sexual history evidence related to Doe while
    excluding relevant evidence disputing Roe's allegation ........22

ix. The decision was at odds with the credible evidence ...............22

III. Title Ix-Selective Enforcement ........................................................................23

A. Failure to pursue charges against Roe while aggressively pursuing the
    same charge against Doe ....................................................................23

B. The severity of the punishment was informed by Doe's gender...........24

IV. Colgate Breached its Contract with Doe ..........................................................25

A. Defendants imposed a disciplinary sanction without Due Process.......25

B. Further breaches of contract ................................................................26

C. Common Law/Denial of basic fairness, implied contract ....................27

D. Estoppel and Reliance .........................................................................27

E. New York Human Rights Law ..............................................................27

CONCLUSION........................................................................................................28

## TABLE OF AUTHORITIES

**Cases**                                                                                          **Page**

*Brentwood Acad. v. Tenn. Secondary Scho. Ath. Ass'n*,
 531 U.S. 228 (2001)............................................................................................16

*Celotex Corp. v. Catrett*,
 477 U.S. 317 (1986).............................................................................................5

*Chadwick v. Wellpoint, Inc.*,
 561 F.3d 38 (1st Cir. 2009)................................................................................ 7

*Coleman v. Wagner College*,
 429 F.2d 1120 (2d Cir. 1970).........................................................................15,17

*Deskovic v. City of Peekskill*,
 894 F. Supp2d 443 (S.D.N.Y. Sept. 25, 2012.....................................................13

*Doe v. Amherst Coll.*,
 238 F.Supp. 3d 195 (D. Mass. 2017)..................................................................23

*Doe v. Columbia University*,
 831 D.3d 46 (2d Cir. 2016)...............................................................................6,9

*Doe v. Miami Univ.*,
 882 F.3d 579 (6th Cir. 2018) ............................................................................23

*Doe v. Quinnipiac Univ.*,
 2019 WL 3003830 (D. Conn. July 10, 2019) ..................................................6, 25

*Doe v. Rensselaer Polytechnic Inst.*,
 2019 WL 181280 (N.D.N.Y. Jan. 11, 2019).......................................................... 5

*Doe v. Syracuse Univ.*,
 341 F. Supp. 3d 125 (N.D.N.Y. 2018)................................................................23

*Gally v. Columbia Univ.*,
 22 F. Supp. 2d 199 (S.D.N.Y. 1998)..............................................................25, 26

*Gischel v. University of Cincinnati, et al.*,
 302 F. Supp.3d 961 (S.D. Ohio, June 26, 2018)..................................................23

*Green v. Scully*,
 850 F.2d 894 (1988)..........................................................................................13

*Menaker v. Hofstra*,
    2019 WL 3819637 (2nd Cir. 2019)....................................................................9,17

*Owens v. Treder*,
    873 F.2d 604 (2d Cir 1989)..................................................................................14

*Papaspiridakos v. Educ. Affiliates, Inc*.,
    2013 WL 4899136  at *3 (E.D.N.Y Sept. 11, 2013) aff'd, 580 Fed. Appx. 17
    (2d Cir. 2014).......................................................................................................25

*People v. Huntley*,
    15 NY2d 72 (NY 1965) ...................................................................................13,21

*Prasad v. Cornell Univ*.,
    2016 WL 3212079, at *22 (N.D.N.Y. Feb. 24, 2016) .........................................27

*Rossley v. Drake Univ*.,
    342 F. Supp. 3d 904 (S.D. Iowa 2018) ..................................................................6

*Sybalski v. Indep. Grp. Home Living Program, Inc.,*
    546 F.3D 255 (2d. Cir. 2008).................................................................................16

*Walker v. Schult*,
    2016 WL 4203536 * 9 (N.D.N.Y. Aug. 9, 2016) ................................................20

*U.S. Siddiqui*,
    699 F.3d 690 (2nd Cir. 2012)................................................................................13

*Yusuf v. Vassar College*,
    35 F.3d 709 (2d Cir. 1994)...........................................................................6,8,24

## PRELIMINARY STATEMENT

Plaintiff John Doe ("Plaintiff" or "Doe") respectfully submits this memorandum in opposition to Defendant Colgate University's Motion for Summary Judgment which seeks to dismiss all of Plaintiff's causes of action. The Court should deny Defendant's motion in its entirety because there are genuine issues of disputed material fact which preclude summary judgment.

Contrary to Defendant's allegations, Doe does not merely contend that decisions made during Colgate's disciplinary process that were unfavorable to him must have been due to gender bias. In so claiming, Colgate overlooks the procedural errors and particular facts of this case which raise a material question of fact as to whether gender bias was a motivating factor behind Colgate's erroneous finding of responsibility and Doe's resultant expulsion. These circumstances include: (i) failing to appoint an independent investigator to investigate Roe's claims against Doe; (ii) relying on statements made by Plaintiff, a 19-year-old freshman, while under significant duress during a hostile custodial interrogation conducted by a skilled New York State police investigator to find him responsible for a violation of university policies; (iii) failing to probe the numerous inconsistencies within Roe's statements; (iv) admitting evidence prejudicial to Doe while excluding similar evidence related to Roe; and (v) failing to pursue charges against Roe for the same misconduct alleged against Doe. That Doe was found not responsible for three of the four charges brought against him, or that Colgate had once previously found a female student responsible for a policy violation, does not disprove his gender bias claims.

Of equal import, Doe also argues that Defendant willfully breached a multitude of contractual obligations.  Most notably, Defendant failed to protect Doe's enumerated right to be free from disciplinary sanction absent due process as it facilitated, encouraged and jointly participated in State Police Investigator Dennis Dougherty's unlawful intrusion into Doe's rights.

1

## **FACTUAL BACKGROUND**

Plaintiff John Doe matriculated as a freshman at Colgate in the fall of 2016. (Doe Decl. ¶ 4). In the early morning hours of October 30, 2016, Doe, after a night out in which he consumed alcohol but was not intoxicated, went to Frank Dining Hall on Colgate's campus for a late-night snack. (Doe Decl. ¶ 10). When Doe got to the dining hall, he noticed Jane Roe sitting by herself, so he sat with her. (Doe Decl. ¶ 11). When Doe got up to leave, Roe asked him where he was going. (Doe Decl. ¶ 12). Doe said he was going back to his room. Roe joined him, although Doe did not ask her to. (Doe Decl. ¶ 12).

Doe and Roe entered Doe's residence hall together at 2:03 a.m. (Doe Decl. ¶ 13). Once they got to Doe's room, Roe went immediately to Doe's bed. (Doe Decl. ¶ 14). Doe and Roe began engaging in consensual foreplay. (Doe Decl. ¶ 14). Both removed their shirts. (Doe Decl. ¶ 14). Roe told Doe that if he could take her bra off, she would have sex with him. (Doe Decl. ¶ 15). Doe took Roe's bra off and they had sexual intercourse. (Doe Decl. ¶ 15). Sometime after the first episode of intercourse, Roe told Doe that if he could name one Donald Trump policy with which he agreed, she would again have sex with him a second time. (Doe Decl. ¶ 16). Doe named one such policy, and the two again engaged in sexual intercourse. (Doe Decl. ¶ 16). Doe and Roe then fell asleep together in Doe's bed. (Doe Decl. ¶ 17). At approximately 4:30 a.m., Doe woke up when he felt Roe's hand touch his penis. (Doe Decl. ¶ 18). Doe interpreted this, as well as the position of Roe's body, as a sign that Roe wanted to again engage in sexual intercourse. (Doe Decl. ¶ 18). Doe and Roe then engaged in sexual intercourse for a third time. (Doe Decl. ¶ 18). During this third act of intercourse, Doe and Roe changed positions, and Doe heard Roe express verbal pleasure. (Doe Decl. ¶¶ 18-19). Roe did not indicate to Doe, either verbally or physically, that she wanted to discontinue the sexual encounter. (Doe Decl. ¶ 19). Doe and Roe fell asleep again after

2

the encounter. (Doe Decl. ¶ 20). Roe awoke around 6:00 a.m., asked Doe what time it was, and left his room shortly thereafter. (Doe Decl. ¶ 21).

Approximately four months after the consensual sexual encounter, on February 26, 2017, Roe contacted Marilyn Rugg of Colgate's Title IX Office for the purpose of filing a report.  Rugg referred Roe to Investigator Valerie Brogan ("Brogan") of Colgate's Campus Safety Department, and they met, on February 28, 2017, along with Rebecca Ralph, who acted as a "scribe," to record the exchange[1]. (Ex. C, D 18-20). Despite Roe's request to only "file a report," at the meeting, Brogan provided her with a breakdown of both the EGP process and the law enforcement options, with a recommendation for the Campus Sexual Assault Victim's Unit ("CSU") manned by Investigator Dennis Dougherty ("Dougherty"). Brogan took the report and classified the complaint as "Rape (1st Degree)." (Ex. C, D 18-20).

On March 3, 2017, Roe contacted Brogan and advised her that she had decided to go through with a criminal process. Brogan then contacted Investigator Dougherty of the CSU, on Roe's behalf. (Ex. C, D 21).  Brogan scheduled the meeting for the following Tuesday, March 7, 2017 (*Id*.) Brogan further facilitated the meeting by unlocking a room customarily used by Dougherty (Ex. W, Dougherty Dep. 140:11-24) and then making the introduction between Roe and Dougherty before going about her business (*Id*. at 146:6-16). Dougherty met with Roe, took her statement, and immediately escalated the investigation.  (*Id*. at 132-136).

On March 22, 2017, Dougherty enlisted Roe to place a recorded, "one-way consent call" to Doe. (Doe Decl. ¶ 24). Brogan facilitated the controlled phone call by, again, arranging for that

---

[1] It is somewhat curious that a supervisor, Brogan, would be the one to take the report, at campus security, despite Brogan's claim that she does not take reports in her investigator capacity, or her law enforcement liaison capacity or as member of law enforcement.  More curious still, is the fact Colgate, for some suspicious reason, ensures the presence of a scribe but does not retain the Scribe's notes.

room despite her not being present, and provided Doe's cell phone number and class schedule[2] to Dougherty. (Ex. V, Brogan Dep. 166:6-12; 172:3-18). Doe was unaware that he was being recorded. (Doe Decl. ¶ 24). Though Roe attempted to get Doe to admit he had sexually assaulted her, Doe maintained that all three acts of intercourse were consensual. (Doe Decl. ¶¶ 26-27).

The following day, March 23, 2017, Brogan was an active participant in a ruse to trick Doe into meeting with Dougherty. Brogan arranged for Dougherty to use a room at Colgate's Campus Safety Department to conduct a custodial interrogation of Doe. (Ex. C, D 29). An unknown male called Doe and advised him someone "was looking to speak with" him, instructing him to report to Campus Safety as soon as possible. (Doe Decl. ¶ 32). Doe voluntarily appeared for this surprise interrogation, unaware that this requested meeting was with a police investigator and that criminal charges were involved. (Doe Decl. ¶¶ 33; 35). Doe appeared at Campus Security, was directed to the infamous basement interrogation room, and was met by Dougherty. (Doe Decl. ¶ 38).  Doe was shocked and surprised by Dougherty's ambush. (Doe Decl. ¶ 38). The interrogation started at 3:24 p.m. (Ex. C, D 36). By 3:30 p.m., Doe was hysterical and suffered from extreme emotional disturbance, prompting Dougherty to call Brogan and ask for a visit from mental health counseling (Doe Decl. ¶ 61; D 35). The counselor, however, was not permitted to enter the closed room until the custodial interrogation was over, nearly 90 minutes later.  (Doe Decl. ¶ 62).

 Doe was pressured by Dougherty to sign a "Voluntary Statement" about the alleged incident. (Doe Decl. ¶¶ 63-65). The statement included words suggested to him by Dougherty, which Dougherty obtained by employing characteristic coercive interrogation techniques such as

---

[2] The Family Educational Rights and Privacy Act ("FERPA") prohibits an educational agency or institution from disclosing personally identifiable information contained in an eligible student's education records without the student's prior written consent except to the extent that FERPA authorizes disclosure without consent. See 34 CFR section 99.31. An institution's record of a student's class schedule constitutes an "education record" subject to FERPA rights and protections. As Doe never provided consent for the disclosure of his class schedule, Brogan thus violated FERPA in providing this information to Dougherty.

playing on Doe's fragile emotional state and questioning Doe's manhood, faith and relationship to his family. (Doe Decl. ¶¶ 58-59, 64, Ex. X Dougherty Interrogation). Doe was arrested on March 28, 2017. (Doe Decl. ¶ 68).

On April 6, 2017, Doe was notified that he was being charged with violations of Colgate's EGP. (Doe Decl. ¶ 70). Doe was interviewed by Brogan on April 21, 2017 and May 4, 2017. (Doe Decl. ¶¶ 71, 74). Doe appeared for an Equity Grievance Hearing Panel on May 31, 2017. (Doe Decl. ¶ 75). On June 6, 2017, Doe was notified that the Panel found him responsible for non-consensual sexual intercourse, for the third act of intercourse that occurred in the early morning of October 30, 2016. (Doe Decl. ¶ 79). The Panel relied primarily on the evidence collected by Dougherty; specifically, the "voluntary statement" and the pretext phone call. (Doe Decl. ¶ 81). On June 16, Doe submitted an appeal based on various procedural errors and the disproportionately of the sanction. (Doe Decl. ¶ 82). Ultimately, on August 14, Doe's final appeal was denied and the findings and sanction upheld. (Doe Decl. ¶ 86). Doe's Colgate transcript now bears the notation "Expelled after a finding of responsibility for a code of conduct violation." (Doe Decl. ¶ 87).

## **ARGUMENT**

### I.   **Legal Standards**

#### A.  **The Summary Judgment Standard**

Under Rule 56(c), summary judgment is proper "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." *See Celotex Corp. v. Catrett,* 477 U.S. 317, 322–23 (1986).

#### B.  **Title IX**

It is well recognized that Title IX is enforceable through an implied right of action, for monetary damages and injunctive relief. *Doe v. Rensselaer Polytechnic Inst.,* 2019 WL 181280

(N.D.N.Y. Jan. 11, 2019). In *Yusuf v. Vassar College* (35 F.3d 709 (2d Cir. 1994)), the Second Circuit held that a plaintiff's challenge to a university disciplinary proceeding on grounds of gender bias can proceed in two ways: (i) erroneous outcome, or (ii) selective enforcement.

To demonstrate an erroneous outcome: "a complaint may allege particular evidentiary weaknesses behind the finding of an offense such as a motive to lie on the part of a complainant or witnesses, particularized strengths of the defense, or other reason to doubt the veracity of the charge. A complaint may also allege particular procedural flaws affecting the proof." *Yusuf,* 35 F.3d at 715. As to the second factor: "Such allegations might include, *inter alia,* statements by members of the disciplinary tribunal, statements by pertinent university officials, or patterns of decision-making that also tend to show the influence of gender." *Yusuf,* 35 F.3d at 715.

A Plaintiff may also establish a violation of Title IX under the Selective Enforcement theory. This claim "asserts that, regardless of the student's guilt or innocence, the severity of the penalty and/or the decision to initiate the proceeding was affected by the student's gender." *Yusuf*, 35 F.3d at 715; *see Doe v. Quinnipiac Univ.,* 2019 WL 3003830, at *10 (D. Conn. July 10, 2019); *Rossley v. Drake Univ.,* 342 F. Supp. 3d 904, 933 (S.D. Iowa 2018).

### C.   The Title VII Burden-Shifting Framework

In the Second Circuit, Title IX cases are analyzed under the *McDonnell Douglas* burden-shifting framework. *See Doe v. Quinnipiac Univ.,* 2019 WL 3003830, at *9 (D. Conn. July 10, 2019). In *Doe v. Columbia University*, 831 F.3d 46 (2d Cir. 2016), the Second Circuit applied by analogy the framework of shifting burdens of proof of discriminatory intent that courts apply in Title VII employment cases, stating" "a complaint under Title IX, alleging that the plaintiff was subjected to discrimination on account of sex in the imposition of university discipline, is sufficient with respect to the element of discriminatory intent…if it pleads specific facts that support a minimal plausible inference of such discrimination." *Columbia*, 831 F.3d at 54-55. As "smoking

gun" proof of discrimination is rare, a plaintiff ordinarily uses circumstantial evidence to meet the test set out in *McDonnell Douglas*. *See Chadwick v. WellPoint, Inc.,* 561 F.3d 38 (1st Cir. 2009).

## II.     Title IX- Erroneous Outcome

Plaintiff presents sufficient evidence to raise questions of fact as to (i) whether Colgate reached an erroneous outcome when it found John Doe responsible for violations of Colgate's policies, and (ii) whether that finding was motivated by gender bias.

### A.     Plaintiff has sufficient evidence to cast articulable doubt on the accuracy of the outcome.

The record is replete with evidence that casts articulable doubt on the accuracy of the outcome reached; specifically:

- Upon arriving in Doe's residence hall at 2:03 a.m., Doe and Roe began engaging in consensual foreplay. (Cmplt. ¶¶ 65-66) After engaging in two acts of consensual intercourse between 2:03 a.m. and 4:30 a.m., (Cmplt. ¶¶ 65-68), Doe and Roe fell asleep together in Doe's bed. (Cmplt. ¶ 69)

- At approximately 4:30 a.m. Doe woke up when he felt Roe's hand brush his penis. (Cmplt. ¶ 70)

- Doe interpreted this contact by Roe, along with the position of Roe's body, as a sign that Roe wanted to again engage in intercourse. (Cmplt. ¶ 70)

- At that point, they did engage in consensual sexual intercourse again, for the third time. (Cmplt. ¶ 70)

- During this third act of intercourse, Doe and Roe changed positions, Roe got on top of Doe, and Roe verbally expressed pleasure by moaning. (Cmplt. ¶¶ 5, 71, 198)  Doe and Roe fell asleep together in Doe's bed, before Roe left around 6:00 a.m. (Cmplt. ¶ 72)

Doe confirmed that all three interactions were consensual during the pretext call. Importantly, this call took place on March 22, prior to Doe being notified that either a criminal complaint, or a Colgate EGP matter, had been initiated. Unaware that he was being recorded and that a New York State detective was listening in on the call (Ex. A, Doe Dep. 84:1-11), Doe maintained "I remember you giving like verbal consent…like multiple times." (Ex. A, D 74).

The numerous inconsistencies and omissions in Jane Roe's account of the event further cast significant doubt on the accuracy of the outcome. For instance:

- Roe reported to Dougherty that she ran into Doe at Slices, but could not remember if he was at the fraternity party earlier in the night; in contrast, she told Brogan that she met up with friends including Doe at the fraternity party. (Compl. ¶ 112; Ex. C, D 25 and D 28);

- Roe told Dougherty that she knew Doe "through the Crew Team" but they "were not friends," while she told Brogan that she and Doe "were friends but not super close." (Compl. ¶ 112; Ex. C, D 25 and D 28);

- Roe told Dougherty that when she got to Doe's room she was "sitting on his bed" and asked if they could watch a movie but Doe declined; yet, she told Brogan that Doe "pushed her up on the bed" and that Doe then "got the computer for watching a movie." (Compl. ¶ 112; Ex. C, D 25 and D 28);

- Roe reported to Dougherty that Doe started to pull her clothes off, while reporting to Brogan that Doe started taking his own clothes off. (Compl. ¶ 112; Ex. C, D 25 and D 28);

- Roe claimed that she accompanied Doe back to his room around 12:30 or 1:00 a.m.; however, Doe did not swipe his gate card to his residence until 2:03 a.m. (Compl. ¶ 113; Ex. C, D 28);

- Roe stated Doe did not get anything to eat at Frank Dining Hall, however Doe's University Card records confirmed he did purchase food; (Compl. ¶ 113; Ex. C, D 28 and D 60);

- Roe maintained that she left Doe's room at 4:30 a.m.; however, University records indicate she did not return to her residence hall until 6:12 a.m. (Compl. ¶ 113; Ex. C, D 29 and D 59);

- Roe did not tell Brogan or Dougherty that she and Doe engaged in sexual intercourse *twice* prior to falling asleep. (Compl. ¶ 114; Ex. C, D 25-26 and D 28-29);

- Roe alleged that she was too fearful to walk by Doe's residence hall, yet attended a party in his residence hall, in close proximity to his room, on April 2017. (Ex. C, D 51; Ex. O, EGP Tr., 65:12-67:6);

The foregoing evidences articulable doubt sufficient to satisfy Plaintiff's initial burden of production for an "erroneous outcome" case under *Yusuf.*

**B.      Plaintiff has evidence of "particular circumstances suggesting that gender bias was a motivating factor" in the University's disciplinary action against him.**

Assuming, arguendo, Colgate articulates a non-discriminatory reason why its disciplinary process was unfair and partial, and complied with its obligations under the applicable policies, Plaintiff's burden would then be to provide evidence of "particular circumstances suggesting that gender bias was a motivating factor behind the erroneous finding."

### i.   *Sex Discrimination/Gender Bias & Procedural Irregularities*

One month ago, the Second Circuit addressed the District Court's unwarranted limitation on the application of *Doe v. Columbia*, signaling a palpable sea of change in Title IX, and Title VII, jurisprudence in explicitly condemning the lower courts' overly narrow interpretation of the sufficiency of evidence to raise an inference of bias. *See Menaker v. Hofstra*, 2019 WL 3819631 (2nd Cir. 2019). The Second Circuit recognized, where there is an adverse action by a university in response to allegations of sexual misconduct, the presence of "a clearly irregular investigative or adjudicative process," along with other factors like "at least some pressure" on the university amid criticism for reacting inadequately to allegations of sexual misconduct by members of one sex, can create a plausible inference of gender bias. *Menaker,* 2019 WL 3819631 at 20-21.

Plaintiff submits there is significant evidence of procedural irregularities in the instant matter that were undertaken amid, and in reaction to, extensive public criticism both within Colgate's campus community and simmering national outrage. In accordance with the recent decision, there is, at a minimum, a triable issue of fact as to whether there is gender bias in the instant matter.  There is no question, however, that the investigation in the instant matter does not survive due process scrutiny.

### ii.   *Enough is Enough and the Sins of Dougherty*

By 2015, Colgate had experienced significant negative press and public attention regarding the mishandling of disciplinary matters. *See Faiaz v. Colgate University*, 64 F. Supp 336

(N.D.N.Y. 2014).  After multiple law suits, student protests including a "sit-in" by female students unhappy with the university, as well as a palpable distrust among a volatile student body, well-publicized OCR investigations into civil rights violations and Colgate's own Professor, Michael Johnson's, public criticism of their unjust disciplinary process, Colgate and it's agents, Brogan, Rugg and Taylor among them, were surely elated to meet the excited Campus Sexual Assault Victim Unit ("CSU") Investigator Dennis Dougherty, eagerly handing out business cards and attending "brown bag" lunches at the Woman's Center excitedly offering his services to anyone who would listen.  Colgate was certainly responsive as Dougherty acknowledged it was within the "top 3" in the investigative action he so desperately craved.

Dougherty, a New York State Police Investigator, volunteered to join CSU, a task force formed pursuant to New York's "Enough is Enough" legislation, New York Education Law Art. 129-B ("Enough is Enough"). The new law was enacted to combat the campus sexual assault "epidemic," and explicitly requiring all colleges and universities in New York to implement uniform prevention and response policies and procedures relating to sexual assault, domestic violence and related misconduct. Much like the related Dear Colleague Letter, Enough is Enough aimed to increase reporting, investigation and prosecution of sexual violence on college campuses. Colleges, including private universities like Colgate, were subject to audit and if their policies and procedures were not in compliance with the law, they risked losing funding.  Colgate altered its EGP policy in response to Enough is Enough.  (Rugg Dep. 24:19-25:23).  Schools were also expected to cooperate with CSU and encourage CSU investigations of campus sexual violence.

### iii. NY State Police Investigator Dougherty Joins the Campus Sexual Assault Victim's Unit:  Irregular Investigations Ensue

Investigator Dougherty, a zealous lifelong member of law enforcement, whose father served the people of upstate New York for decades before him, volunteered for the position at

CSU to do his part to curb campus sexual assault[3] at the approximately thirty (30) colleges and universities he was assigned to in upstate New York. (Ex. W, Dougherty Dep. 52:7-17). Dougherty's duties certainly included bringing his well-honed investigative prowess to allegations of sexual assaults on campuses, but he was also expected to increase the amount of campus sexual assault reports and be available to college campuses to encourage reporting. (Ex. W, Dougherty Dep, p. 55-56:5-25). From the time Dougherty made contact with his long-time law enforcement colleague Brogan, another lifetime veteran of upstate New York policing with extensive family members engaged in law enforcement across the state, until the moment he left CSU, dissatisfied with the arrest total, Dougherty was graced with loyal cooperation and unmatched preferential treatment as the go-to, first-option called, sex crime investigator at Colgate. Defendant granted Dougherty unfettered access to campus, and their students, for any law enforcement purpose he desired, including but not limited to, providing facilities to meet with witnesses and perform one-way recorded phone calls, providing student information like class schedules and personal information, and traditional law enforcement investigatory tasks. Most notably, as previously mentioned, Colgate's agents, including Brogan, assisted Dougherty in jointly executing a ruse to lure Doe into a surprise custodial interrogation designed to manipulate Doe's emotions.

Dougherty's investigation, in particular his admission of non-neutral, pre-determined finding of guilt based on his observing Roe make a one-way call, as well as his admitted manipulation of Doe within the custodial interrogation, cannot withstand due process scrutiny or

---

[3] Dougherty, on multiple occasions, cited the long-debunked statistic of 1 in 5 college females being victims of sexual assault during his non-party deposition. (Ex. W, Dougherty Dep. 55:18-56:2). The seasoned, dedicated criminal investigator cited the vast overestimate as both his initial motivation for joining the CSU, and his reason for leaving the position less than two years later.  Dougherty viewed his job as ramping up the sheer number of reports, investigations and arrests.  There was not enough action for Dougherty, who called Enough is Enough "an abject failure, the amount of cases that came in.  Like, if one in five women are being sexually assaulted on college campuses—like, I went into this fully believing I was going to be working case after case after case.  And it was not that way." *See* Ex. W, Dougherty Dep., pp. 192-193.

the taint of gender discrimination. The bias and lack of fairness evident in Dougherty's treatment of Doe, particularly when he was caught on the one-way recording of the call telling Roe, "He's an asshole!"  The unprofessional, careless conduct belies Dougherty's self-interested claims of treating all suspects with respect. The admission that he left CSU for the lack of arrests, and continued reliance on the long- debunked study finding that "1 in 5 college women are victims of sexually assault" are also indicative of a willingness to believe all female complainants. Dougherty readily admitted to adhering to the trauma-informed approach and the fact the trauma informed approach changed "a lot" of his law enforcement practices obtained over the last two decades. In practice, as was the case here, Dougherty is not a neutral fact finder[4].  His goal is to build a case against a male student who is alleged to have sexually assaulted a female complainant, whom the investigator implicitly believes to be telling the truth.  He readily acknowledged he was not neutral.

As discussed further below, one practice Dougherty certainly honed to expert levels of state intrusion, is the discreet, nuanced trickery and psychological manipulation inherent in a seasoned investigator's coercive interrogation technique. in which the veteran investigator disingenuously, and maliciously, manipulates a suspect's emotional well-being during interrogation.

Dougherty used a ruse, with Brogan and Campus Security's immense cooperation, joint acts and facilitation, to lure Doe to his custodial interrogation. Dougherty acknowledged he often lies to suspects, telling them they are 'good guys' when he does not believe it. (Ex. W, Dougherty Dep. 168:20-169:14). The purpose of said technique is to trick the suspect, and pressure him, and elicit the vague, hypothetical non-confession described above.  Dougherty also acknowledged Doe

---

[4] While Dougherty is not required to be "neutral," as a criminal investigator, he is expected to respect an individual's constitutional rights.  Further, as discussed above, his actions in the instant matter were so intertwined with Defendant's, that Defendant must be held accountable for Dougherty's actions.  Colgate is therefore responsible for a non-neutral investigator obtaining the chief evidence used against Doe in the EGP hearing, the recorded phone call and coerced, involuntary statement.

was not free to leave, "I've done enough *Huntley*[5] hearings." He then read him *Miranda* warnings, which Dougherty laughably claimed to believe a suspect is entitled to. (Ex. W, Dougherty Dep. 157:20-158:7). Dougherty violated Doe's constitutional rights by obtaining a statement after an illegal seizure, then repeated trickery and pressure. *See People v. Huntley*, 15 NY2d 72 (NY 1965).

In addition to the unconstitutional coercion and trickery, the *Miranda* warnings were wholly ineffective, and the continued custodial interrogation violated due process, because Doe was too emotionally disturbed to be interrogated. *See Green v. Scully,* 850 F. 2d 894 (1988); *see also U.S. v. Siddiqui,* 699 F.3d 690 (2nd Cir. 2012)*; Deskovic v. City of Peekskill*, 894 F. Supp2d 443 (S.D.N.Y. Sept. 25, 2012). Voluntariness of statement is judged under the totality of the circumstances test, those factors that a court should consider include (1) the characteristics of the accused, (2) the conditions of interrogation, and (3) conduct of law enforcement officials. *Green,* 850 F. 2d at 901-903. Factors that indicate the instant statement was not voluntary include Plaintiff's age (19), the location of the interrogation (basement at campus security), Plaintiff's mental well-being (suffering from extreme emotional disturbance warranting mental health treatment which he was denied) and the conduct of the officer (Dougherty tricked Doe into coming to campus safety, proceeded to engage in psychological manipulation and, despite noting emotional disturbance early in the investigation proceed to interrogate). Dougherty acknowledged both Doe's feeling he was not free to leave and the apparent, compromised mental health at the outset of the interrogation, noting he was emotional, distressed and traumatized. (Ex. W, Dougherty Dep. 158-176). His actions reflect this acknowledgement as he contacted Brogan for the assistance of a mental health counselor. (Ex. W, Dougherty Dep. 160:3-6). After calling, he

---

[5] Huntley hearings are pre-trial hearings in New York State criminal matters, in which the circumstances surrounding a defendant's statement to police is assessed to determine whether it was given voluntarily, free from coercion. If the judge finds the statement was illegally obtained, against a defendant's will via coercion, pressure, tricks and the like, of if the statement was the product of an unlawful seizure, then the prosecution cannot admit said statement into evidence. *See People v. Huntley*, 15 NY2d 72 (NY 1965).

then proceeded to interrogate the compromised, fragile 19-year-old for 90 to 100 minutes, over 90% of which the counselor was at campus safety waiting to speak. Dougherty confirmed he was in no way a neutral investigator as the counselor was not present for Doe's support during the interrogation; Dougherty admitted he was not concerned with Doe's well-being, and right to a mental-health counselor/support person, as he was with Roe.  Dougherty callously stated he was primarily "worried about [his] case."  (Ex. W, Dougherty Dep. 176:23-177:12).

The underhanded tactic was unjust, impartial and obviously violates due process. It likely played a role in the prosecutor only charging a misdemeanor and then offering an ACD plea in the criminal matter; with 6 months of good behavior the charge is removed from an individual's criminal record[6].  Doe may challenge the voluntariness of the statement in this matter and submits the statement was obtained by coercion, trickery and undue duress. Dougherty violated Doe's Fifth Amendment, Sixth Amendment and Fourteenth Amendment rights. As described above, Defendant should be held to a heightened standard. Defendant's active participation, cooperation and facilitation of Doe's unlawful seizure and unconstitutional custodial interrogation was a violation of due process guaranteed by the Fourteenth Amendment and Colgate's policy.  Further, Defendant's acceptance of the coerced statement as a confession, and absurd reliance on the poorly summarized version written by Dougherty, at the EGP hearing constitutes an independent violation of Doe's constitutional rights and his rights under the Policy.

### iv.  Colgate's Liability for Dougherty's Unfair Treatment of Doe

Doe respectfully submits this Court should scrutinize the disciplinary sanction, and the process by which it was reached, under heightened standards given the state's intervention in the

---

[6] The plea of guilty to the ACD, which is sealed, in no way restricts Doe's ability to challenge the voluntariness of the statement in this matter. There is no collateral estoppel of claims, defenses or constitutional challenges unless the matter or issue was fully litigated by the same parties at the prior proceeding.  *See Owens v. Treder*, 873 F.2d 604 (2d Cir 1989).

EGP process at Colgate in the form of Dougherty. The intertwined relationship between Dougherty and Colgate created a rare scenario in which Colgate may be held responsible for the state police's imposition into the disciplinary process.  Defendant facilitated Dougherty's unjust intrusion into their student's life, then utilized the fruits of that violation as evidence-in-chief for their disciplinary hearing.  Further, Dougherty's position was created by New York State for the very purpose of ingratiating himself with Colgate and inserting himself into the private university's Title IX disciplinary function. Of the thirty schools he was assigned to, Colgate was one of the most receptive to his efforts; it was in the top three schools as far as volume of reporting to Dougherty. (Ex. W, Dougherty Dep. 63:6-25). The Enough is Enough legislation was aimed at combating what the state deemed to be an insufficient response to allegedly massive underreporting of sexual violence against women on campuses across New York.  This confluence of intrusive state legislation directed at a perceived public concern on college campuses, combined with an aggressive state actor's meddling in the affairs of a sensitive private university, while rare, is not a matter of first impression in New York.

The Second Circuit addressed a similar matter in *Coleman v. Wagner College*, 429 F.2d 1120 (2d Cir. 1970).  The Court of Appeals held, when the state has intervened in the performance of a function traditionally entrusted to a private organization, the maintenance of internal order by private universities, the imposition of disciplinary sanctions by the private university is subjected to scrutiny under the Fourteenth Amendment. *Coleman* at 1121. In *Coleman*, Wagner College, a private institution, sought to discipline students pursuant to rules adopted in accordance with a New York state statute concerned with preventing campus disorder, such as sit-ins and protests.

Similar to *Coleman*, the instant matter presents the "converse of the public function doctrine." *Coleman* at 1121. When the state provides "significant encouragement" to the entity, the entity is a "willful participant in joint activity with the [s]tate," or the entity's functions are

"entwined" with state policies, commonly referred to as "the joint action test" or "close nexus test." *See Sybalski v. Indep. Grp. Home Living Program, Inc.*, 546 F.3d 255 (2d Cir. 2008) *quoting Brentwood Acad. v. Tenn. Secondary Sch. Ath. Ass'n*, 531 U.S. 288, 296 (2001). The relationship could not have been closer between Dougherty and Colgate.  They jointly participated in each other's functions, formed a beneficial symbiotic relationship, and, when Dougherty was a member of CSU, moved in a state of true interdependence when performing their joint, cooperative actions. As such, it is appropriate, in the instant matter, to scrutinize the imposition of Colgate's sanctions to heightened scrutiny. The private conduct may be held up to due process standards, because the state actor and private entity were so entwined with one another's functions to form a close nexus.

The symbiotic relationship between Colgate and Dougherty was the cause of the injury to Doe. The unjust expulsion was caused by the following evidence of entwinement:

- Colgate's EGP policy changed in response to Enough is Enough (Ex. P, Rugg Dep. 24:19-25:23) and Dougherty was assigned to the CSU (Ex. W, Dougherty Dep. 52:7-17); From the moment Dougherty stepped on Colgate's campus as a member of CSU he aggressively worked towards increasing the sheer number of reports, arrests and prosecutions; he justified his overzealous intrusion into Colgate's disciplinary process by citing the long-debunked "One in Five" study (Ex. W, Dougherty Dep. 55:18-56:2).

- Dougherty was encouraged and assisted in his function of criminal investigations by Defendant in that: Taylor included his contact information in her PowerPoint regarding sexual misconduct, and hosted him to present at "brown bag" meet and greets to introduce Dougherty to the Colgate community. (Ex. M, 3283-3314; Ex. W, Dougherty Dep. 62-68; Ex. L, D 3260).

- Dougherty was shown preferential treatment and provided extreme cooperation by Val Brogan, Lyn Rugg and their agents, in Campus Safety and Title IX. For instance, Brogan provided Dougherty unrestricted access to Colgate's facilities, rooms and agents (Ex. V, Brogan Dep. 165-172; 201-203) as well as  information on student's class schedules and contact information (Ex. V, Brogan Dep. 106:17-24; 203-204) for purposes of interviewing witnesses and speaking with complainants to convince them to proceed with formal reports (Ex. W, Dougherty Dep. 145-146), Colgate often held off on issuing non-contact orders until his investigation was concluded, including in the instant matter (Ex. W, Dougherty Dep. 147:11-17), and utilized trickery and dishonesty in luring Doe to Campus Safety (Ex. W, Dougherty Dep. 153-157) to conduct coercive, unconstitutional interrogations for the purpose of obtaining false confessions to be used in both the criminal setting and for Colgate's EGP process. (*See*

Ex. V, Brogan Dep. 180, acknowledging "crossover" investigations). Colgate, via Brogan, Taylor, Rugg and their subordinate agents, performed multiple cooperative acts to facilitate Dougherty's unfair, partial investigation, surveillance, intrusive recording, unconstitutional custodial interrogation and arrest of Doe; and, further, the unjust, unfair and partial disciplinary matter, from investigation to hearing to sanction of expulsion of Doe by providing confidential HIPAA and FERPA protected information. (Ex. W, Dougherty Dep. 174-176).

- Colgate postponed their EGP investigation until after Dougherty arrested Doe (Ex. W, Dougherty Dep. 148:15-20) knowing they would use his paperwork for their own EGP process. As per his customary practice and "prior track record" (Ex. W, Dougherty Dep. 185:17-189:22), Dougherty turned over all his police paperwork and evidence to Brogan for use in the disciplinary, EGP matter. (Ex. W, Dougherty Dep. 138:3-25).

As depicted above, there was an abundance of interdependence between Dougherty and Colgate in this matter. As such, Colgate must be held to a heightened level of scrutiny. The entire EGP disciplinary process, which led to the imposition of an expulsion, must be scrutinized under heightened standards. This scrutiny, Doe respectfully submits, renders the expulsion fundamentally unfair.  Dougherty, with the cooperation, encouragement and assistance of Colgate, failed to provide due process to Doe in the investigation of Roe's complaint.  At a minimum, the unjust conduct amounts to the irregular process addressed by the Second Circuit in *Meanaker v. Hofstra*, if not the heightened standard of *Coleman v. Wagner*.  Under either Second Circuit decision, the private university can be held accountable for the acts of a non-employee.

### v. Failure to investigate Roe for non-consensual sexual contact, while aggressively pursuing the same charge against Doe.

Colgate demonstrated bias against Doe as the male accused when it failed to investigate, or otherwise take any action, with respect to Doe's allegation that Roe touched his penis to initiate sexual activity while he was asleep, yet aggressively pursued Roe's claim against Doe for the same charge. Colgate's policy provides that a person "cannot consent if that individual is incapacitated…Incapacity may be caused by…sleep…" (Ex. J, D 1660). Doe notified Colgate on multiple occasions that after the first two instances of consensual sexual intercourse with Roe, he

fell asleep and was subsequently awoken by Roe when she touched his penis, which he understood as her initiating a third sexual encounter.

Specifically, during the March 22, 2017 pretext call, Doe stated, "I was sleeping and you uh reached over to like my penis and started like rubbing and said fuck me. I hope you remember that." (Ex. C, D 75). The following day, March 23, 2017, Doe provided the same account to Dougherty, stating "I think it was 4:30-5:00 a.m., I woke up when I felt her hand brush my penis." (Ex. C, D 37). In his interview with Brogan on April 21, Doe again reported that he and Roe "had sex twice, and then had both fallen asleep. He said he woke up to her touching his penis, and then they had sex a third time." (Ex. C, D 44). Doe confirmed this at the hearing as well, when he stated Roe "grabbed my penis and was trying to arouse me, and that was before the third time. And I was also asleep when that happened,…" (Ex. O, EGP Tr., 72:1-4).

Marilyn Rugg, Colgate's Title IX Coordinator and the individual responsible for ensuring a "fair and equal process of the adjudication of any concerns that fell under the Equity Grievance Policy" (Ex. P, Rugg Dep. 15:19-23), testified that according to Colgate's policies, an individual cannot consent if they are asleep. (Ex. P, Rugg Dep., 63:1-6). Thus, upon being notified of Doe's allegations against Roe, Colgate had an obligation to pursue the claims with the same vigor with which it pursued Roe's claim. Turning a blind eye toward potentially exculpatory evidence as against Roe, and potentially inculpatory evidence as against Doe, was a blatant example of bias on account of sex. Colgate's failure to pursue an investigation of Doe's complaint can only be explained by gender bias against the male accused, as opposed to an "anti-respondent bias."

### vi.   Failure to appoint a neutral investigator to investigate Doe's case.

Colgate further exhibited gender bias against Doe when it permitted Valerie Brogan to serve as the investigator on Doe's case despite her conflicted entanglement with the criminal matter. Rugg testified that there were approximately 35 members on the EGP during the relevant

timeframe, all of whom were trained to serve in the role of investigator. (Ex. P, Rugg Dep., 18:9-11; 20: 21:11-18). Nonetheless, Colgate permitted Brogan to remain the investigator assigned to Doe's EGP case, even though she was heavily involved in the criminal case, as follows:

- Brogan put Roe in touch with Dougherty to file a criminal complaint against Doe; (Ex. V, Brogan Dep. 162:14-23, 163:1-9; Ex. C, D 27)

- Brogan facilitated the controlled phone call by arranging for a room on Colgate's campus and providing Doe's cell phone number and class schedule[7] to Dougherty; (Ex. V, Brogan Dep. 166:6-12; 172:3-18)

- Brogan assisted Dougherty in detaining and interrogating Doe, in a room on Colgate's campus; (Ex. V, Brogan Dep. 164:19-23; 165:4-12; Ex. C, D 35)

- Brogan attended Doe's arraignment hearing, and thereafter delivered a copy of the Order of Protection to Roe. (Ex. V, Brogan Dep. 192:2-16; Ex. C, D 38) While asserting her usual practice is to attend court proceedings involving Colgate students, "no matter what the charges concern," (Brogan Decl., ECF 44-3, ¶¶ 19-20) the attendance at such proceedings, and delivery of an order of protection to the complainant in an ongoing EGP investigation raises serious doubt concerning her ability to thereafter remain an impartial investigator; the doubt is amplified by Brogan's apparent, attempted concealment of this service in an April 4, 2017 email to Roe (Ex. G, D 299); and

- Brogan actively ignored inconsistencies in Roe's variations on her story, in particular Brogan obtained, but failed to highlight, Roe's dorm card swipe records which corroborate Doe's timeline and catches Roe in an affirmative misrepresentation as to the time she returned to her dorm (Ex. C, D 7-82)

- Brogan otherwise colluded with the New York State Police to effectuate Doe's arrest and criminal prosecution.

While Brogan alleges in her Declaration that her involvement in the foregoing did not bias her against Doe, at a minimum it creates the appearance of impropriety and raises serious doubts

---

[7] The Family Educational Rights and Privacy Act ("FERPA") prohibits an educational agency or institution from disclosing personally identifiable information contained in an eligible student's education records without the student's prior written consent except to the extent that FERPA authorizes disclosure without consent. See 34 CFR section 99.31. An institution's record of a student's class schedule constitutes an "education record" subject to FERPA rights and protections. As Doe never provided consent for the disclosure of his class schedule, Brogan thus violated FERPA in providing this information to Dougherty.

concerning her ability to act impartially. Notably, the Declarations signed by Colgate employees, drafted by counsel several years after the events at issue and prepared for purposes of defeating Doe's bias claims, highlights the numerous issues of material fact rather than dispels them. [8]

### vii. Colgate's improper reliance on the criminal case file.

Colgate further demonstrated a bias against Doe as the male accused when the Hearing Panel members relied primarily on the voluntary statement and the controlled phone call in reaching their findings. (Ex. Q, Johnson Dep. 50:22-51:4; 52:2-4 acknowledging, "It was his statements to law enforcement and his statements to her on the phone that were the delta at the end."; Ex. R, Solle Dep. 74:4-9). The Panel ignored that Dougherty failed to perform a neutral investigation. As a Senior Investigator of the Campus Sexual Assault Unit, Dougherty understood the purpose of the unit, and legislation initiating its creation, was to "increase reporting to make our services more available to college communities," based on the premise that "more than one in five women has been subjected to sexual assaults during their college careers." (Ex. W, Dougherty Dep. 55:18-56:2). Dougherty acknowledged his partiality towards Roe when he testified that although he was a neutral party going into the phone call… "after this controlled phone call, that had influenced me to the point- like, I guess I had---watching her experience there, like, I just believed 100 percent—well, maybe I shouldn't say 100 percent. I believe that this had happened and was a legitimate complaint." (Ex. W, Dougherty Dep. 109:12-18). The Panel was indisputably aware of Dougherty's lack of partiality, given that he referred to Doe as an "asshole" during the controlled call (which was played in its entirety during the hearing) (Ex. O, EGP Tr., 55:3-4), blatantly acted as an advocate for Roe (Ex. S, Jones Dep. 52:6-7, stating, "I think from the tape I

---

[8] See Walker v. Schult, 2016 WL 4203536, at *9 (N.D.N.Y. Aug. 9, 2016) discussing sham affidavit rule; "a witness's conflicting affidavit and deposition must *not* be excluded from consideration in the determination of the question whether there is any genuine issue as to any material fact."

understood [Dougherty] to be very much an advocate for [Roe]"), and utilized characteristic interrogation techniques to obtain a "confession" from Doe. (Ex. A, Doe Dep. 91:8-92:21). Plaintiff submits that Colgate's use of these two pieces of improperly obtained evidence blatantly reflects its gender bias against Doe.

Further, it was improper for the panel to consider the information obtained by Dougherty as it was procured through a criminal interrogation. Notably, while Brogan testified that in her role as investigator for Colgate she does not conduct interrogations, which are by their nature adversarial (Ex. V, Brogan Dep. 44:16-24), Dougherty testified that he provided Doe with *Miranda* warnings because he "has been through enough *Huntley* hearings in my life to say, okay, so you're in the basement of Campus Safety talking to this guy, like, a reasonable person isn't going to be free to leave." (EX. W, Dougherty Dep. 158:24-159:3). Undoubtedly, Brogan, a former detective of 23 years, was aware that this "interview," which she helped to facilitate, was in fact a custodial interrogation and thus, that the confession was obtained by a method not permitted by Colgate's policies (which, according to Brogan, require "interviews" rather than "interrogations"). Brogan does not have "clean hands," here.  She facilitated the unlawful seizure and involuntary custodial interrogation.  Brogan was made aware of Doe's need for a counselor, but accepted the statement as evidence. Despite obtaining the recording of the one-way consent call, she mysteriously avoided obtaining the recording of the interrogation, of which she knew there would be issues. Nonetheless, the Voluntary Statement was included as part of the submission to the Hearing Panel, reminiscent of the unconstitutional *Elkins*' "Silver Platter Doctrine," which cited the alleged "confession" as evidence leading to a finding of responsibility.

Despite Brogan's self-proclaimed impartiality, her "investigation" of Doe's case was a sham. She merely adopted the evidence collected by Dougherty as her own, failing to perform any independent examination of facts or collection of evidence, and ignoring the disparate nature of

criminal and university Title IX proceedings. For instance, Brogan never performed a follow up interview with Roe to probe her on the various internal inconsistencies raised in her accounts or demonstrated by the available objective evidence. Nor did she ask Roe to respond to Doe's version of events. (Ex. C, D 7-82). Instead, Brogan's submission of Dougherty's criminal file to the EGP Hearing Panel gave her "investigation" the imprimatur of law enforcement, conveyed a presumption of guilt against Doe, and ultimately contributed to the erroneous finding of responsibility. The failure to perform a separate and impartial investigation, and reliance on a tainted criminal case file to ensure a finding of responsibility, raises a question of fact as to whether the erroneous finding was motivated by a gender bias against Doe as the male accused.

### viii.  Consideration of sexual history evidence related to Doe while excluding relevant evidence disputing Roe's allegations.

Colgate's Policy in effect during the relevant timeframe explicitly stated "Each party shall have the right to exclude from consideration during the hearing, for purposes of determining responsibility, the party's sexual history with persons other than the other party...." (Ex. J, D 1677). Nonetheless, Taylor permitted consideration of an allegation that Doe had been "aggressive" with females in the past during the hearing, (Ex. O, EGP Tr. 92:13-23) while prohibiting evidence that refuted witness claims concerning the alleged impact of the incident on Roe on the grounds that such evidence implicated Roe's sexual history. (Ex. U, Taylor Dep. 146:14-20).

### ix.  The decision was at odds with the credible evidence.

Gender bias against Doe is further reflected by the responsibility finding in light of the conflicting and inconsistent information provided by Roe. Brogan and the Hearing Panel utterly failed to probe the numerous inconsistencies presented both internally within Roe's different accounts of the events, and as contradicted by the objective evidence, as set forth at length above in Section II(A). Based on the foregoing, it is inconceivable that a finding against Doe could be

reached by a preponderance of the evidence, raising the question as to whether the finding, despite insufficient evidence, was motivated by bias against the male student, Doe.

### III.     Title IX-Selective Enforcement

#### A. Failure to pursue charges against Roe while aggressively pursuing the same charge against Doe.

The Southern District of Ohio held, in *Gischel v. University of Cincinnati, et al.,* 302 F. Supp.3d 961 (S.D. Ohio, June 26, 2018), that the university selectively enforced its policies when it chose to only investigate a claim of non-consent made by the female accuser, even though it had knowledge that the male accused student was intoxicated and thus unable to consent to sexual activity. The court noted that the male student was not required to make a formal complaint of sexual assault against his female accuser if the university had actual knowledge that the male student may have been too intoxicated to consent under university policies. The failure to investigate the accuser's actions constituted a Title IX selective enforcement claim.

This Court adopted this line of reasoning in *Doe v. Syracuse Univ.,* 341 F. Supp. 3d 125 (N.D.N.Y. 2018), when it held that a male former student, who was expelled for violating the university's sexual misconduct policy, adequately alleged facts that plausibly supported at least a minimal inference of gender bias on the part of university under the "selective enforcement" theory. Specifically, even though both plaintiff and the accuser were intoxicated to the point where both of their judgments would have been impacted during the incident at issue, the university *sua sponte* took action against plaintiff but took no similar action against the accuser for her conduct. *See also Doe v. Amherst Coll.,* 238 F. Supp. 3d 195 (D. Mass. 2017).

Similarly, Plaintiff here has sufficiently alleged a Title IX selective enforcement claim. Colgate failed to investigate whether Roe properly obtained consent from Doe when she initiated sexual contact with him while he was sleeping, and thus, unable to consent. As described above, Colgate had sufficient notice of Roe's misconduct. *See Doe v. Miami Univ.,* 882 F.3d 579 (6th Cir.

2018). Nonetheless, Colgate chose only to open an investigation into Doe, satisfying the elements of a Title IX selective enforcement theory.

### B.  The severity of the punishment was informed by Doe's gender.

A selective enforcement claim can also be established when the plaintiff demonstrates that the "school treated similarly situated members of the opposite sex—that is, members of the opposite sex facing comparable disciplinary charges—differently." *Yusuf*, 35 F.3d at 716. Here, there is a direct comparator in the case of the one female respondent who was disciplined by Colgate for a sexual misconduct related allegation in February 2018. The female respondent was found responsible for non-consensual sexual contact **and** sexual harassment and issued a 2-year suspension, thus permitting her to return to Colgate upon completion of the suspension. (Ex. N, D 3331). In contrast, Doe was found responsible for non-consensual sexual intercourse and assessed a permanent expulsion.

While both "non-consensual sexual contact" and "non-consensual sexual intercourse" are defined as "Sexual Assault" under Colgate's EGP Policy (Ex. J, D 1661), Doe, the male respondent, was assessed a much more severe punishment in the form of expulsion than the female respondent, notwithstanding that she was also found responsible of the additional charge of sexual harassment. Notably, Appeal Panel member Mark Thompson testified that the Appeal Panel upheld the decision and sanction in Doe's case, finding that a suspension was not warranted "[b]ecause a finding of responsibility for sexual assault is a significant offense and one that we believed warranted separation from the institution." (Ex. T, Thompson Dep. 39:10-19). Yet, this same reasoning did not apply in the case of the female respondent. In fact, the Hearing Outcome Letter specifically noted that an expulsion was warranted, in part, due to "identical sanctions in other EGP cases involving nonconsensual sexual intercourse consisting of ***penile vaginal penetration***." (Ex. D, D 102). The foregoing is directly indicative of Colgate treating a similarly-

situated female student more favorably and thus, supports an inference of anti-male, as opposed to anti-respondent, bias, as well as a selective enforcement claim.

Accordingly, "Plaintiff's proffered record evidence demonstrates that there is a triable issue of fact on whether he was subject to an unfair process when compared to the treatment of the female students under the *McDonnell Douglas* burden-shifting framework, which suffices to meet his minimal burden of establishing his prima facie case that gender was a motivating factor in the decision to discipline him, for both his claims of erroneous outcome and selective enforcement." *Doe v. Quinnipiac Univ.,* 2019 WL 3003830, at *14 (D. Conn. July 10, 2019).

## IV.   Colgate breached its contract with Doe

Defendant Colgate breached its contract with Doe by failing to provide a number of the bargained-for rights explicitly promised to Doe under the Policy and Student Handbook.  It is well established in New York that the relationship between a university and its students is contractual in nature.  See *Papaspiridakos v. Educ. Affiliates Inc.*, 2013 WL 4899136 at *3 (E.D.N.Y sept. 11, 2013), *aff'd*, 580 Fed. Appx. 17 (2d Cir. 2014).  The contract's terms are "supplied by the bulletins, circulars, and regulations made available to the student."  *Gally v. Columbia Univ.*, 22 F. Supp. 2d 199, 206 (S.D.N.Y. 1998). Most importantly, a college is contractually bound to provide a student with the procedural safeguards that it has promised.  *See Yu v. Vassar Coll.*, 97 F. Supp 3d 448, 481 (S.D.N.Y. 2015). Colgate failed to provide Doe with the procedural safeguards the university was contractually bound to provide.

### A.  Defendants Imposed a Disciplinary Sanction without Due Process

Colgate, in its Student Handbook, explicitly recognizes each of their students are entitled to "the right to be secure in one's person, speech, living quarters, papers and effects against unreasonable search and seizure; and the **right to be free from disciplinary sanction except by due process,** with avenues of recourse available when a student claims to have been subjected to

prejudicial, discriminatory or capricious treatment." (emphasis added). While courts do not find a school's general policy or 'aspirational' statements to be binding or enforceable, the aforementioned sentence in the Handbook is a direct, explicit recognition by Colgate of Doe's right to be free from unconstitutional search and seizure as well as freedom from expulsion absent due process of law. The improperly obtained Dougherty evidence, an involuntary statement obtained despite Doe's emotionally disturbed state, resulted in a serious sanction, expulsion. For the reasons stated herein, Colgate breached its contract with Doe in violating his due process rights.

### B.  Further Breaches of Contract

In addition to the aforementioned breach of contractual due process by Defendant, there were a number of contractual provisions Doe was entitled to which Defendant willfully disregarded and wholly failed to perform. The following acts amount to independent breaches of contract as Defendants acted arbitrarily, in bad faith, and failed to substantially comply with its own Policy. *Gally*, at 206.

- Colgate's policy states: "In the event that any person assigned a role pursuant to this policy is aware of any relationship, fact, circumstance or occurrence that he or she reasonably believes creates or constitutes a conflict of interest that would render him or her incapable of performing the role in an impartial manner, that person shall identify the conflict to the associate provost of equity and diversity at the earliest practicable time." (Ex. J, D 1669) Brogan should have recused herself from Doe's case given she initially received Roe's report, assisted Roe in obtaining a protective order against Doe, facilitated Dougherty's detaining and interrogating of Doe, attended the criminal protective order hearing, and otherwise colluded with Dougherty to effectuate his arrest and criminal prosecution.

- Colgate's Policy states "Unless the chair determines it is appropriate, no one will present information or raise questions concerning: (1) incidents not directly related to the possible violation unless they show a pattern, or (2) the character of the reporting individual or responding individual." (Ex. J, D 1677) Yet, Taylor permitted inclusion of the allegation that Doe had been "aggressive" with other females in the past. Separately, Taylor had a friendly e-mail exchange with Roe in which she was completely deferential as to what prior relationship information Roe was willing to provide.  (Ex. F, D 268-269)

26

- Failing to provide John Doe with the same protections explicitly afforded the complainant under Colgate's policies; facilitating, condoning, and eventually using against Doe a coerced statement, extracted from Doe while Doe was under extreme psychological and emotional duress; obfuscating material evidence – the recorded pretext call – by falsely claiming ignorance as to whether the call was recorded (and thus available for Doe to review);  employing a method of investigation – the so-called "trauma-informed approach" –specifically designed to bolster the accounts of female accusers and rationalize their inconsistencies, to the detriment of the male accused.

- Failing to provide Doe the opportunity to be heard in front of a fair and impartial tribunal and failing to provide John Doe the opportunity to confront and cross-examine witnesses at a fair hearing.

- Arbitrarily and capriciously expelling Doe by unjustly finding that Roe did not consent to intercourse, when Roe herself admitted that she willingly switched positions, thereby indicating affirmative consent.

### C.  Common Law/Denial of basic fairness, implied contract

In the event the Court finds the aforementioned breaches are not violative of the specific, explicit covenants, the covenants are certainly guaranteed implicitly under common law contract principles of fairness, fair dealing and freedom from arbitrary and capricious decision making.

### D.  Estoppel and Reliance

In addition to the breached contract provisions above, Plaintiff respectfully submits there is sufficient evidence to establish an equitable estoppel claim. Doe asserts Colgate's conduct amounts to blatant false representations and concealment of material facts. Colgate, through its agents made said false representations with the intention that Doe act upon said conduct and representations; and Colgate, through its agents, possessed knowledge of the real facts. *Prasad v. Cornell Univ.*, 2016 WL 3212079, at *22 (N.D.N.Y. Feb. 24, 2016).

### E.  New York Human Rights Law

The Court should undertake the same analysis as Title IX above and find Defendant violated Doe's constitutional and contractual rights to due process, and were motivated by a bias against Doe based on his gender.

27

## <u>CONCLUSION</u>

For the reasons set forth above, Plaintiff respectfully submits that the Court should deny

Defendant's motion for summary judgment in its entirety, along with such other and further relief

as the Court deems just and proper.

**Dated:**  **New York, New York**
 **September 13, 2019**

 **NESENOFF & MILTENBERG, LLP**
 *Attorneys for Plaintiff*

 **By:** */s/ Andrew T. Miltenberg*
 **Andrew T. Miltenberg, Esq. (517014)**
 **Tara J. Davis, Esq. (519928)**
 **Nicholas E. Lewis, Esq. (700674)**
 **363 Seventh Avenue, Fifth Floor**
 **New York, New York 10001**
 **(212) 736-4500**
 **amiltenberg@nmllplaw.com**
 **tdavis@nmllplaw.com**
 **nlewis@nmllplaw.com**