**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF NEW YORK**

**JOHN DOE,[1]**

                                              **Plaintiff,**

                    **v.**                                              **5:17-CV-1298**
                                                                          **(FJS/ATB)**

**COLGATE UNIVERSITY,**

                                              **Defendant.**

**APPEARANCES**                              **OF COUNSEL**

**NESENOFF & MILTENBERG, LLP**              **ANDREW MILTENBERG, ESQ.**
363 Seventh Avenue – 5th Floor              **STUART BERNSTEIN, ESQ.**
New York, New York 10001                    **TARA J. DAVIS, ESQ.**
Attorneys for Plaintiff                     **NICHOLAS EVAN LEWIS, ESQ.**

**BOND, SCHOENECK & KING, PLLC**            **LAURA H. HARSHBARGER, ESQ.**
One Lincoln Center
Syracuse, New York 13202
Attorneys for Defendant

**SCULLIN, Senior Judge**

**MEMORANDUM-DECISION AND ORDER**

**I. INTRODUCTION**

        Plaintiff, who is identified by the pseudonym John Doe, brings this action against

Colgate University ("Defendant") seeking compensatory damages, prejudgment interest,

attorney's fees, expenses, costs, and disbursements.  *See generally* Dkt. No. 1, Compl.

───────────────

[1] Magistrate Judge Baxter granted Plaintiff's unopposed motion to proceed under pseudonym.
*See* Dkt. No. 17.

Defendant has moved for summary judgment pursuant to Rule 56 of the Federal Rules of Civil Procedure, *see* Dkt. No. 44, and for an order precluding Plaintiff's expert, Dr. Stan V. Smith, Ph.D., from testifying with respect to hedonic damages, *see* Dkt. No. 45.

## II. BACKGROUND

On February 26, 2017, a student referred to as "Jane Roe" informed a university official that she wished to formally report a sexual assault, which she claimed occurred during the night of October 29, 2016, into the early morning of October 30, 2016, on Defendant's campus. *See* Dkt. No. 44-16, Def's Stmt. of Material Facts, at ¶ 13; *see also* Dkt. No. 1 at ¶¶ 58-76. Although the specific facts of the alleged assault are clearly in dispute, Plaintiff and Roe agree that, while in Plaintiff's dorm room, they kissed, engaged in foreplay, had sexual intercourse twice before falling asleep, and engaged in sexual intercourse a third time upon waking in the early hours of October 30, 2016. *See id.* at ¶¶ 66-70.

In her formal report, Roe alleged that Plaintiff "pushed her onto the bed," "started kissing [her] and taking his clothes off," and digitally penetrated her even though she told him she was "not in the mood." *See id.* at ¶¶ 96-99. Roe then reported that Plaintiff had sex with her and was "holding [her] down" and that she woke up around 4:00 a.m. because Plaintiff was penetrating her. *See id.* at ¶¶ 100-101. Roe claimed that she explicitly told him "no" and tried to squirm away but could not because Plaintiff's hands were on her hips. *See id.* at ¶ 102.

Plaintiff, to the contrary, contends that the kissing, foreplay, and episodes of sexual intercourse were consensual. *See id.* at ¶¶ 66-68. Plaintiff claims that, at approximately 4:30 a.m., he awoke to Roe's hand brushing his penis. *See id.* at ¶ 70. Plaintiff interpreted this, as well as the position of Roe's body, as a sign that Roe wanted to engage in sexual intercourse a third time; and Plaintiff proceeded to have sex with her. *See id.*

On either March 2nd or 3rd, 2017, Roe informed Campus Safety Investigator Valerie Brogan that she wished to file a criminal complaint against Plaintiff and asked for assistance in getting in touch with the police. *See* Dkt. No. 44-16 at ¶ 15; *see also* Dkt. No. 55-27, Pl's Response to Stmt. of Material Facts, at ¶ 15. Brogan assisted Roe by contacting New York State Police Campus Sexual Assault Victims Unit Investigator Dennis Dougherty. *See* Dkt. No. 44-16 at ¶ 16. Brogan then arranged for Dougherty to use a room on campus to meet with Plaintiff and Roe and investigate their accounts. *See id.* at ¶ 17; *see also* Dkt. No. 55-27 at ¶ 17.

On March 22, 2017, Dougherty and Roe placed a "controlled" call to Plaintiff. *See* Dkt. No. 44-16 at ¶ 19. During the call, Roe attempted to get Plaintiff to admit that he had sexually assaulted her; meanwhile Plaintiff was unaware that he was being recorded. *See* Dkt. No. 1 at ¶ 118. In that call, Plaintiff denied that their sexual contact was non-consensual, indicated that he remembered Roe giving "verbal consent … like multiple times," that he recalled Roe initiating the third act of sexual intercourse, and that he did not remember her saying "no." *See* Dkt. No. 55-4, Controlled Call T., at 69-71.

The next day, March 23, 2017, Dougherty met with Plaintiff on campus, which Plaintiff refers to as an "interrogation." *See* Dkt. No. 44-16 at ¶ 20; Dkt. No. 55-27 at ¶ 20. Plaintiff signed a "Voluntary Statement" at that time, although he contends that it was not voluntary. *See* Dkt. No. 44-16 at ¶ 21; Dkt. No. 55-27 at ¶ 21. In the Voluntary Statement, Plaintiff admitted it was possible that Roe was asleep when he began to penetrate her during the third act of intercourse, but Plaintiff maintains that his statement was coerced. *See* Dkt. No. 55-4, Voluntary Statement, at 31-32; *see generally* Dkt. No. 55-26, Pl's Decl., at ¶¶ 40-59.

On either March 27th or 28th, 2017, Roe informed Brogan that, in addition to her criminal complaint, she wished to move forward with a formal complaint against Plaintiff

pursuant to Defendant's Equity Grievance Policy ("EGP"), which sets forth the procedures for making, investigating, and adjudicating complaints of misconduct.[2]  *See* Dkt. No. 44-16 at ¶¶ 5, 25; Dkt. No. 55-27 at ¶ 25.  Brogan began investigating Roe's allegations by interviewing Plaintiff, Roe, and several witnesses.  *See* Dkt. No. 44-16 at ¶¶ 27-33.  She also received copies of information in Plaintiff's criminal case file, including his and Roe's statements to Dougherty and a recording of the controlled call.  *See* Dkt. No. 44-3, Brogan Decl., at ¶ 33.

As a result of the EGP investigation, Kimberly Taylor, Associate Dean for Conduct, issued Plaintiff a charge letter on May 16, 2017, containing the following four charges: (1) non-consensual sexual contact alleging that he kissed Roe without her consent, (2) sexual exploitation alleging that he removed articles of Roe's clothing without her consent, (3) non-consensual sexual intercourse alleging that he digitally penetrated Roe without her consent, and (4) non-consensual sexual intercourse alleging that he penetrated Roe with his penis without her consent.  *See id.* at ¶ 37.

Both parties were present throughout the EGP hearing, as were their attorneys, and they had the right to ask questions of the other party through Dean Taylor as the Chair of the EGP Hearing Panel.  *See id.* at ¶¶ 46-47.  After two sessions of deliberations, the three Hearing Panelists found Plaintiff not responsible for the first three charges and unanimously found him responsible for the fourth charge.  *See id.* at ¶¶ 52-54; Dkt. No. 55-27 at ¶¶ 52-54.  Specifically, the Panel found that Roe was asleep and unable to consent to the third act of intercourse in the morning of October 30, 2016.  *See* Dkt. No. 1 at ¶ 201.  As a result of this finding, the Hearing

---

[2] Instead of being found "guilty" or "not guilty" of misconduct, the Hearing Panel adjudicating a complaint would find the respondent "responsible" or "not responsible."  Therefore, the Court uses these terms throughout this Memorandum-Decision and Order.

Panelists decided on the sanction of expulsion.  *See* Dkt. No. 44-16 at ¶ 56.  Plaintiff appealed

this decision twice, but his expulsion was upheld.  *See id.* at ¶¶ 58-65.

Plaintiff then filed his complaint in the instant action on November 27, 2017, alleging

the following five causes of action:

(1) violation of Title IX of the Education Amendments of 1972, 20 U.S.C. § 1681 *et seq.*, under the theories of erroneous outcome and selective enforcement;
(2) breach of contract;
(3) breach of contract/common law: denial of basic fairness/arbitrary and capricious decision making;
(4) estoppel and reliance; and
(5) violation of New York State Human Rights Law.

*See generally* Dkt. No. 1.

## III. DISCUSSION

### A. Defendant's motion for summary judgment

#### 1.  *Legal standard governing motions for summary judgment*

Rule 56 of the Federal Rules of Civil Procedure governs motions for summary

judgment.  Under this Rule, the entry of summary judgment is warranted "if the movant shows

that there is no genuine dispute as to any material fact and the movant is entitled to judgment as

a matter of law."  Fed. R. Civ. P. 56(a).  When deciding a summary judgment motion, a court

must resolve any ambiguities and draw all reasonable inferences in a light most favorable to the

nonmoving party.  *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986) (citation

omitted).

### 2. *Plaintiff's gender discrimination claims*[3]

Title IX provides, in relevant part, that "[n]o person in the United States shall, on the basis of sex, be excluded from participation in, be denied the benefits of, or be subjected to discrimination under any education program or activity receiving Federal financial assistance…" 20 U.S.C. § 1681(a). Therefore, "Title IX bars the imposition of university discipline where gender is a motivating factor in the decision to discipline." *Yusuf v. Vassar Coll.*, 35 F.3d 709, 715 (2d Cir. 1994) (citation omitted).

"Plaintiffs attacking a university disciplinary proceeding on grounds of gender bias can be expected to fall generally within two categories." *Id.* Plaintiffs alleging a violation based on the "erroneous outcome" theory claim that they are "innocent and wrongly found to have committed an offense." *Id.* Plaintiffs alleging a violation based on the "selective enforcement" theory claim that, "regardless of the student's guilt or innocence, the severity of the penalty and/or the decision to initiate the proceeding was affected by the student's gender." *Id.* Plaintiff proceeds under both theories in his complaint, and the Court analyzes each in turn.

### a. *Erroneous outcome*

To succeed under an "erroneous outcome" theory at the summary judgment stage, a plaintiff "must demonstrate (1) 'articulable doubt [as to] the accuracy of the outcome of the disciplinary proceeding,' and (2) that 'gender bias was a motivating factor behind the erroneous

---

[3] Plaintiff alleges causes of action for gender discrimination pursuant to Title IX of the Education Amendments of 1972 and pursuant to the New York Human Rights Law ("HRL"). "Identical standards" apply to discrimination claims under Title IX and the HRL; and, therefore, the Court addresses these claims together. *Weinstock v. Columbia Univ.*, 224 F.3d 33, 42 n.1. (2d Cir. 2000).

finding.'" *Doe v. Colgate Univ.*, 760 F. App'x 22, 30 (2d Cir. 2019) (summary order)[4] (quoting [*Yusuf*, 35 F.3d at 715]).  In *Colgate Univ.*, both the District Court and the Second Circuit assumed that the plaintiff raised a disputed issue of material fact on the question of misconduct by insisting that the sexual encounters for which he was suspended were consensual.  *See Doe v. Colgate Univ.*, No. 5:15-CV-1069 (LEK/DEP), 2017 WL 4990629, *11-*12 (N.D.N.Y. Oct. 31, 2017), *aff'd* 760 F. App'x at 30.  Thus, the Second Circuit ruled, "to resist summary judgment, [the plaintiff] must demonstrate a genuine dispute of material fact as to whether [the defendant]'s actions were motivated by gender bias."  *Colgate Univ.*, 760 F. App'x at 30.

Here, assuming that Plaintiff's insistence that the third act of sexual intercourse was consensual creates a genuine dispute of material fact on the question of misconduct, the Court must consider whether Plaintiff provided sufficient evidence that gender bias motivated Defendant's decision to expel him. According to Marilyn Rugg, Associate Provost for Equity and Diversity and Defendant's Title IX Coordinator, her role was to oversee "the EGP policy and process, its implementation, [and] ensure[ ] a fair and equal process of the adjudication of any concerns that fell under the Equity Grievance Policy."  *See* Dkt. No. 55-17, Rugg Dep., at 15:19-23.  Plaintiff asserts however, that the EGP process was far from "fair and equal," and that Defendant's environment, its investigation of Plaintiff, and EGP hearing were all biased against Plaintiff as a male.  For the following reasons, the Court finds that Plaintiff has provided sufficient evidence to show gender bias against him in Defendant's investigation and adjudication of Roe's claims.

---

[4] The cited case is a *different* lawsuit against Colgate University brought by a different John Doe.  In the cited case, Judge Kahn granted the defendant's motion for summary judgment, and the Second Circuit affirmed that decision.  *See generally Doe v. Colgate Univ.*, No. 5:15-CV-1069 (LEK/DEP), 2017 WL 4990629 (N.D.N.Y. Oct. 31, 2017), *aff'd* 760 F. App'x 22 (2d Cir. 2019) (summary order), *cert. denied*, 139 S. Ct. 2765 (2019).

Plaintiff argues that Dougherty's and Brogan's investigations into Roe's complaint against him were tainted by gender bias for various reasons. Dougherty, as a New York State Police Investigator, is not a defendant in this case; and, contrary to Plaintiff's claims, his conduct as a state actor was not so "interdependent" with Defendant as to hold Defendant vicariously liable for his conduct. *See* Dkt. No. 55, Pl's Memorandum in Opposition to Mot. Summ. J., at 21-22. Furthermore, Plaintiff did not allege a section 1983 claim in his complaint, nor did he allege violations of the Due Process Clause of the Fifth or Fourteenth Amendments. *See generally* Dkt. No. 1.

Defendant can be held liable, however, for Brogan's conduct as the EGP investigator if a reasonable factfinder could find that her investigation was biased against Plaintiff as a male. The Guidelines for the Equity Grievance Process indicate that, after a complaint is made, Ms. Rugg would appoint an EGP member, "who [does] not have a conflict of interest to conduct the investigation." *See* Dkt. No. 44-9, Ex. A, Equity Grievance Policy, at 17. The Guidelines further note that the investigation "is an impartial fact-finding process." *See id.* at 18.

Plaintiff contends that Brogan was not an impartial factfinder because her investigation was entangled with Dougherty's criminal investigation and because she did not thoroughly investigate inconsistencies in Roe's accounts. The evidence supports Plaintiff's contentions. First, after Roe reported the incident to Brogan and stated that she wanted to file a criminal complaint, Brogan called Dougherty on his cell phone and put him in touch with Roe. *See* Dkt. No. 55-23, Ex. V, Brogan Dep. at 161-63. Next, Dougherty asked Brogan to make a room on Defendant's campus available to him to interview witnesses, including Plaintiff; and he ultimately used that room to make the controlled phone call between Roe and Plaintiff and to "interrogate" Plaintiff. *See id.* at 164; *see also* Dkt. No. 55-24, Ex. W, Dougherty Dep. at 140,

146; Dkt. No. 55 at 24.  With respect to the controlled phone call, Brogan testified that

Dougherty told her about his "faux pas" on the call – in which he called Plaintiff an "asshole"

while the call was being recorded – and that he wished he hadn't said it.  *See* Dkt. No. 55-23 at

213-14.  Brogan also attended Plaintiff's criminal arraignment; and, at the hearing, the judge

asked her to take a copy of the order of protection and ensure that Roe received it.  *See id.* at

192.  This, Brogan admitted, was an unusual request; and the judge had only asked her to take

an order of protection to a victim one other time.  *See id.* at 192, 96.  Brogan further admitted

that, in cases like this one, there was a "crossover" between her investigation and Dougherty's

criminal investigation; and she would request the statements or other documentation from

Dougherty's investigation.  *See id.* at 204-05.  At a minimum, this conduct creates an

appearance of a conflict of interest and raises questions of fact about her bias towards Plaintiff.

Additionally, the evidence shows that Brogan failed to probe Roe regarding various

internal inconsistencies raised in her accounts of what happened and countered by available,

objective evidence.  For example, Roe claimed that she accompanied Plaintiff back to his room

around 12:30 or 1:00 a.m.; however, Plaintiff did not swipe his gate card to his residence hall

until 2:03 a.m.  *See* Dkt. No. 55 at 13.  Similarly, Roe maintained that she left Plaintiff's room

at 4:30 a.m., but Defendant's records indicate that she did not return to her residence hall until

6:12 a.m.  *See id.*

Furthermore, Brogan did not ask Roe to respond to Plaintiff's version of the events,

even though Plaintiff responded to Roe's version of the events in order to defend himself from

her allegations.  *See* Dkt. No. 55-27, Pl's Stmt. of Disputed Material Facts, at ¶ 2.  For instance,

Plaintiff claimed that they changed positions during the third act of intercourse, thus putting

Roe on top and giving her "ample opportunity to stop at any point[.]"  *See* Dkt. No. 55-16,

Hearing T., at 72:20-23.  Roe complained that she "tried to push [Plaintiff] off of her and to squirm away, but she couldn't because [he] had his hands on her hips and kept holding her hips down" and that she "thought to herself that she should 'suck it up'" so that she could leave.  *See* Dkt. No. 55-4, Brogan's Investigative Summary, at 11-12.  Yet, despite these blatant inconsistencies, there is no indication that Brogan tried to reconcile Roe's and Plaintiff's versions of the incident.  *See id.*

Looking at the above-stated facts, a reasonable factfinder could find that Brogan was biased against Plaintiff when she entangled herself in Dougherty's criminal investigation, failed to investigate inconsistencies in Roe's account, and did not question Roe about Plaintiff's potentially accurate account of the incident.  Accordingly, the Court holds that there is a genuine dispute as to whether Brogan exhibited gender bias against Plaintiff as the male accused when she conducted the supposedly "impartial" EGP investigation.

      *b.  Selective enforcement*

Plaintiff additionally claims that Defendant violated Title IX based on the theory of selective enforcement because his penalty—permanent expulsion—was affected by his gender.[5] *See* Dkt. No. 55 at 29-30.  "'To support a claim of selective enforcement, [a male plaintiff] must demonstrate that a female was in circumstances sufficiently similar to his own and was treated more favorably by the University.'"  *Yu v. Vassar Coll.,* 97 F. Supp. 3d 448, 480 (S.D.N.Y. 2015) (quotation omitted).  Additionally, "[t]he male plaintiff must show that 'the University's actions against [the male plaintiff] were motivated by his gender and that a similarly situated

---

[5] Insofar as Plaintiff contends that his selective enforcement claim was based on Defendant's decision to initiate the EGP proceeding because of his gender, that claim is dismissed because *Roe* initiated the EGP proceeding here.  *See Prasad v. Cornell Univ.*, No. 5:15-cv-322, 2016 WL 3212079, *18 (N.D.N.Y. Feb. 24, 2016).

woman would not have been subjected to the same disciplinary proceedings.'" *Id.* (quotation omitted).

When analyzing "the question of whether the severity of the penalty was affected by Plaintiff's gender, '[c]ourts have interpreted that standard to require a plaintiff "to allege particular circumstances suggesting a meaningful inconsistency in punishment and particular circumstances suggesting that gender bias was a motivating factor behind the inconsistency."'" *Prasad v. Cornell Univ.*, No. 5:15-CV-322, 2016 WL 3212079, *18 (N.D.N.Y. Feb. 24, 2016) (quoting *Doe v. Columbia* [*Univ.*], 101 F. Supp. 3d [356,] 374 [(S.D.N.Y. 2015)]) (quoting *Scott v. WorldStarHipHop, Inc.*, 2011 WL 5082410, at *5 (S.D.N.Y. Oct. 25, 2011), *aff'd sub nom. Scott v. Berkeley Coll.*, 599 Fed. Appx. 8 (2d Cir. 2015) (summary order)) (other citation omitted). "'[A]pplying that requirement, courts have dismissed claims in the absence of allegations that a school treated similarly situated members of the opposite sex – that is, members of the opposite sex facing comparable disciplinary charges – differently.'" *Id.* (quotation and other citations omitted).

In his complaint, Plaintiff alleged that Defendant "imposed an unjustly severe penalty on [him], and it did so on the basis of his gender." *See* Dkt. No. 1 at ¶ 240. "Specifically, the Panel imposed a sanction on the explicit basis that the act involved a male penetrating a female with his penis.  On information and belief, had [Plaintiff] been a woman found responsible for non-consensual sexual intercourse, [Defendant] would not have imposed a sanction of expulsion." *See id.* at ¶ 241.

Plaintiff was expelled as a result of the Hearing Panel's finding him responsible for non-consensual sexual intercourse, and the Appeal Panel twice upheld that sanction.  *See* Dkt. No. 44-16 at ¶ 62; *see also* Dkt. No. 44-11, Thompson Decl., Ex. A; Dkt. No. 44-13, Susan Smith

Decl., Ex. A.  Dr. Mark Thompson, Interim Vice President and Dean of the College at Colgate University, served on the Plaintiff's first EGP Appeal Panel and testified about discussing the severity of the expulsion with the other Appeal Panelist.  *See* Dkt. No. 55-21, Thompson Dep., at 39.  Mr. Thompson indicated that they talked about whether a suspension would be more appropriate than expulsion but ultimately decided it was not.  *See id.*  According to Mr. Thompson, "[a] finding of responsibility for sexual assault is a significant offense and one that we believed warranted separation from the institution."  *See id.*

Plaintiff points out, however, that there is a direct comparator to his case in that a female respondent was found responsible in February 2018 for non-consensual sexual contact and sexual harassment.  *See* Dkt. No. 55 at 29 (citing Dkt. No. 44-9, Ex. C, Sexual Misconduct R., at 46).  That female respondent was issued a two-year suspension, thus permitting her to return as a student upon completion of the suspension.  *Id.* (citing Dkt. No. 44-9, Ex. C, at 46).  Plaintiff asserts that, although "non-consensual sexual contact" and "non-consensual sexual intercourse" are both defined as "Sexual Assault" under Defendant's EGP policy, Plaintiff, as a male respondent, was assessed a much more severe punishment than the female respondent.  *See id.*; *see also* Dkt. No. 44-9, Ex. A, at 6.

Dean Taylor noted that Defendant "generally regard[s] sexual offenses as being on a continuum of gravity[.]"  *See* Dkt. No. 44-6, Taylor Decl., at ¶ 82.  She attempted to distinguish the female respondent's case by explaining, "[t]hat case did not involve penetration of any kind and therefore did not constitute non-consensual sexual intercourse within the definition of EGP policy."  *See id.* at ¶ 80.  In fact, Dean Taylor further noted, Defendant has not had a single case where a female has been accused of non-consensual penetration of any kind or where a male has claimed to be the victim of non-consensual penetration of any kind.  *See id.* at ¶ 82.

- 12 -

Plaintiff, however, was found responsible for non-consensual sexual intercourse because he was found to have "penetrated [Roe]'s vagina with [his] penis at a time when she was asleep and, therefore, unable to give affirmative consent…" *See* Dkt. No. 55-5, Ex. D, Hearing Findings, at 4.  Due to biological differences between men and women, a female respondent could never be found responsible for this exact conduct.  Thus, for purposes of Title IX selective enforcement litigation, the female respondent is a direct comparator to Plaintiff because they both were found responsible for "Sexual Assault" under the EGP definition. When considering the female respondent as a direct comparator, Plaintiff and she should have been assessed similar or equal penalties.  Instead, the Hearing and Appeal Panelists assessed upon Plaintiff the harshest penalty of expulsion, meaning he could never return to Defendant's university and he would have to disclose his expulsion when applying to attend other schools. The female respondent, however, could ultimately return as a student after two years.

Accordingly, the Court finds that Plaintiff has raised a genuine issue of material fact as to whether Defendant treated female students who were accused of sexual assault more favorably than male students under similar circumstances.  Therefore, the Court denies Defendant's motion for summary judgment with respect to Plaintiff's Title IX claim on the theory of selective enforcement.

### 3.  *Plaintiff's breach of contract claim*

"'In New York, the relationship between a university and its students is contractual in nature.'"  *Colgate Univ.*, 2017 WL 4990629, at *18 (quoting *Papaspiridakos v. Educ. Affiliates, Inc.*, No. 10-CV-5628, 2013 WL 4899136, at *3 (E.D.N.Y. Sept. 11, 2013), *aff'd* 580 Fed. Appx. 17 (2d Cir. 2014) [(summary order)]).  "The contract's terms are 'supplied by the bulletins, circulars and regulations made available to the student.'"  *Id.* (quoting *Gally v.*

*Columbia Univ.*, 22 F. Supp. 2d 199, 206 (S.D.N.Y. 1998)).  "'[W]hen a disciplinary dispute arises between a student and an institution, judicial review is limited to whether the institution acted arbitrarily or whether it substantially complied with its own rules and regulations.'"  *Id.* (quoting *Routh v. Univ. of Rochester*, 981 F. Supp. 2d 184, 208 (W.D.N.Y. 2013)).

Plaintiff alleges that he was denied due process as Defendant's Student Handbook requires. According to Plaintiff, the Handbook states that students are entitled to "the right to be secure in one's person, speech, living quarters, papers and effects against unreasonable search and seizure' and the right to be free from disciplinary sanction except by due process, with avenues of recourse available when a student claims to have been subjected to prejudicial, discriminatory, or capricious treatment."  *See* Dkt. No. 55 at 30-31.  This, Plaintiff argues, is a direct, explicit recognition of his right to be free from unconstitutional searches and seizures as well as freedom from expulsion absent due process of law.  *See id.* at 31.  However, the United States Constitution does not establish the level of due process that Defendant, as a private university, had to give Plaintiff in his disciplinary proceeding.  *See Yu*, 97 F. Supp. 3d at 462. Thus, Plaintiff's claim that he had the right to be free from unconstitutional searches and seizures is inaccurate.

"That said, a 'private university, college, or school may not arbitrarily or capriciously dismiss a student.'"  *Yu*, 97 F. Supp. 3d at 463 (quoting *Bleiler*, 2013 WL 4714340, at *5 (internal quotation marks omitted)).  Defendant's EGP policy requires that the Hearing Panel make findings of responsibility using the "preponderance of the evidence" standard.  *See* Dkt. No. 44-6 at ¶ 79.  In determining whether Defendant acted in accordance with its policies to find Plaintiff responsible by a preponderance of the evidence, the Court must only find "'that [there] was enough evidence, which, if believed, could have supported the board's decision.'"

*Colgate Univ.*, 2017 WL 4990629, at *23 (quoting [*Doe. v. Trs. of*] *Boston Coll.*, [No. 15-CV-10790,] 2016 WL 5799297, at *18 [(D. Mass. Oct. 4, 2016)]).

A reasonable factfinder could find that Defendant failed to afford Plaintiff his rights under the Handbook and the EGP policy by permitting Brogan—who showed bias both through her entanglement with Dougherty's criminal investigation and in her interviews with Roe and Plaintiff—to investigate Roe's EGP accusation.  Furthermore, a reasonable factfinder could find that Defendant capriciously dismissed Plaintiff when it expelled him after a finding of Sexual Assault, as defined in the EGP policy, but it did not expel a female respondent who was also found responsible for Sexual Assault.  Therefore, because there are genuine disputes of material fact as to whether Defendant acted appropriately and substantially complied with its contractual promises in investigating, adjudicating, and sanctioning Plaintiff, the Court denies Defendant's motion for summary judgment on Plaintiff's breach of contract claim.

### 4. *Plaintiff's remaining claims*

In *Doe v. Syracuse Univ.*, a court in this District noted that it was unable to identify any specifically cognizable claim known as "Breach of Contract/Common Law: Denial of Basic Fairness/Arbitrary and Capricious Decision Making."  *Doe v. Syracuse Univ.*, No. 5:18-CV-377, 2019 WL 2021026, *11 n.3 (N.D.N.Y. May 8, 2019).  The court thus interpreted that claim as a breach of the implied covenant of good faith and fair dealing.  *See id.* at *11.  Because that same language is used to describe Plaintiff's third cause of action, *see* Dkt. No. 1 at ¶¶ 272-76, the Court follows the decision in *Syracuse Univ.* and treats this claim as alleging a breach of the implied covenant of good faith and fair dealing.

In *Colgate Univ.*, the court noted that New York law does not recognize a separate cause of action for breach of the implied covenant of good faith and fair dealing when a plaintiff also

pleads a breach of contract claim and the two claims are based upon the same facts. *See Colgate Univ.*, 2017 WL 4990629, at *24. The *Colgate* court held, "Plaintiff's good faith and fair dealing cause of action relies on the same facts as his breach of contract claim – specifically, that the panel found him responsible for sexual misconduct and expelled him despite insufficient evidence. Therefore, this cause of action is duplicative of the breach of contract claim." *Id.* For the same reasons, the Court grants Defendant's motion for summary judgment on Plaintiff's implied contract claims.

Second, as the court in *Prasad* noted, the quasi-contractual cause of action for equitable estoppel "applies only in the absence of an express or implied agreement between the parties." *Prasad*, 2016 WL 3212079, at *22 (citing *Yu*, [97 F. Supp. 3d at 482-83]). Plaintiff's equitable estoppel claim is based on the same facts as those underlying his breach of contract claim. Because it is duplicative of Plaintiff's breach of contract claim, the Court further grants Defendant's motion for summary judgment with respect to Plaintiff's estoppel and reliance claim.

**B. Defendant's motion to preclude expert testimony regarding hedonic damages**

In addition to its motion for summary judgment, Defendant moved to preclude Plaintiff's expert, Dr. Stan V. Smith, Ph.D, from providing his expert opinion at trial as to Plaintiff's value of life ("hedonic") damages.[6] *See* Dkt. No. 45. Defendant contends that Dr. Smith's opinions regarding hedonic damages are speculative, unreliable, and have been excluded by many courts. *See generally* Dkt. No. 45-3, Def's Memorandum in Support of Mot. Preclude, at 8-13.

---

[6] Although Defendant contends that Dr. Smith's report regarding Plaintiff's estimated loss of wages and employee benefits is flawed, it does not seek to preclude that portion of Dr. Smith's report and testimony. *See* Dkt. No. 45-3, Def's Memorandum in Support of Mot. Preclude, at 5.

Additionally, Defendant asserts that Dr. Smith's testimony will not aid the jury; and it may, in fact, confuse the jury.  *See generally id.* at 13-16.

Whether expert testimony is admissible is governed by Federal Rule of Evidence 702 and the Supreme Court's decision in *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579 (1993).  Rule 702 provides the following:

> A witness who is qualified as an expert by knowledge, skill, experience, training, or education may testify in the form of an opinion or otherwise if:
>
> (a) the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue;
> (b) the testimony is based on sufficient facts or data;
> (c) the testimony is the product of reliable principles and methods; and
> (d) the expert has reliably applied the principles and methods to the facts of the case.

Fed. R. Evid. 702.

In *Daubert*, the Supreme Court explained that "under the Rules the trial judge must ensure that any and all scientific testimony or evidence admitted is not only relevant, but reliable."  *Daubert*, 509 U.S. at 589.  The Supreme Court further expanded this rationale to all specialized testimony.  *See Kumho Tire Co. v. Carmichael*, 526 U.S. 137, 147-49 (1999).  Thus, it is the trial court's duty to determine whether expert testimony is relevant and reliable.  *See generally Amorgianos v. Amtrak*, 303 F.3d 256, 265 (2d Cir. 2002).  "[W]hen an expert opinion is based on data, a methodology, or studies that are simply inadequate to support the conclusions reached, *Daubert* and Rule 702 mandate the exclusion of that unreliable opinion testimony."  *Id.* at 266 (citation omitted).

Hedonic damages, such as those at issue here, "value 'the loss of the enjoyment of life as affected by physical pain and suffering, physical disability, impairment and inconvenience affecting an individual's normal pursuits and pleasures of life.'"  *Crawford v. Franklin Credit*

*Mgmt. Corp.*, No. 08-CV-6239 (KMW), 2015 WL 13703301, *8 (S.D.N.Y. Jan. 22, 2015)

(quoting *In re Korean Air Lines Disaster of Sept. 1, 1983*, 807 F. Supp. 1073, 1081 n.7

(S.D.N.Y. 1992)).  The *Crawford* court looked at Dr. Smith's model, which "attempts to value a

person's enjoyment [of] life based on what he or she is 'willing to pay' and is often described as

the 'willingness-to-pay' methodology or model."  *Id.*

Dr. Smith's methodology relies on "'many economic studies on what we, as a

contemporary society, actually pay to preserve the ability to lead a normal life.'"  *Id.* (quotation

omitted); *see also* Dkt. No. 45-2, Ex. B., Dr. Smith's Report, at 13.

> These studies typically analyze three data points: (1) the purchasing decisions of
> consumers who increase or decrease their chance of injury or death when they buy
> certain products with better or worse safety features; (2) the actual wage differentials
> between workers with high-risk jobs, such as police officers, or firefighters, and those
> with lower-risk jobs; and (3) the amount that governments spend, and the extent to
> which they regulate private industry, to reduce the risks of death in the general
> population.

*Crawford*, 2015 WL 13703301, at *8 (citing [Joseph A. Kuiper, *The Courts, Daubert, and
Willingness-to-Pay: The Doubtful Future of Hedonic Damages Testimony Under the Federal
Rules of Evidence*, 1996 U. Ill. L. Rev. 1197, 1207-11 (1996)]).

To explain this methodology, Dr. Smith includes the following hypothetical in his

report: "assume that a safety device such as a carbon monoxide detector costs $46 and results in

lowering a person's risk of premature death by one chance in 100,000.  The cost per life saved

is obtained by dividing $46 by the one in 100,000 probability, yielding $4,600,000."  *See* Dkt.

No. 45-2, Ex. B, at 14.  Using this methodology, Dr. Smith estimated that Plaintiff's loss of

value of life damages would range between $1,564.036 and $2,330,354.  *See id.* at 15.  Dr.

Smith has used this methodology for calculating the "value of life" since the middle of the

1980s.  *See* Dkt. No. 45-2, Ex. C, Dr. Smith's Dep., at 32.

The *Crawford* court rejected Dr. Smith's testimony about his willingness-to-pay methodology for calculating hedonic damages; and, for support, it pointed to the First Circuit's holding that "'[t]he overwhelming majority of courts have concluded that [Dr. Smith's] "willingness-to-pay" methodology is either unreliable or not likely to assist the jury in valuing hedonic damages, or both.'" *Crawford*, 2015 WL 13703301, at *8 (quoting *Smith v. Jenkins*, 732 F.3d 51, 66 (1st Cir. 2013)); (citing *Stokes v. John Deere Seeding Group,* No. 4:12 Civ. 04054 (SLD)(JAG), 2014 WL 675820, at *3 (C.D. Ill. Feb. 21, 2014) ("the weight of mandatory and persuasive precedent counsels strongly against admitting Dr. Smith's [expert] testimony.") (other citation omitted)).  "These decisions typically hold that [Dr.] Smith's methodology is not sufficiently reliable to be allowed at trial." *Id.*

Specifically, the *Crawford* court noted that the First and Seventh Circuits questioned "the logic of relying on career selection and government regulation to quantify an individual's valuation of her own life." *Id.* at *9 (citing *Smith*, 732 F.3d at 67; *Mercado* [*v. Ahmed*], 974 F.2d [863,] 871 [(7th Cir. 1992)]) (other citation omitted).  The Seventh Circuit provided the following:

> [W]e have serious doubts about [Dr. Smith's] assertion that the studies he relies upon actually measure how much Americans value life. For example, spending on items like air bags and smoke detectors is probably influenced as much by advertising and marketing decisions made by profit-seeking manufacturers and by government-mandated safety requirements as it is by any consideration by consumers of how much life is worth. Also, many people may be interested in a whole range of safety devices and believe they are worthwhile, but are unable to afford them. More fundamentally, spending on safety items reflects a consumer's willingness to pay to reduce *risk*, perhaps more a measure of how cautious a person is than how much he or she values life.

*Mercado v. Ahmed*, 974 F.2d 863, 871 (7th Cir. 1992).

"The willingness-to-pay methodology thus requires 'too large a leap to accept' the notion that the consumer, workplace, and regulatory decisions of individual actors, viewed in

the aggregate, 'accurately reflects the value society places on the average human life.'"
*Crawford*, 2015 WL 13703301, at \*9 (quoting *Saia v. Sears Roebuck & Co.*, 47 F. Supp. 2d
141, 148 (D. Mass. 1999)).  Dr. Smith's testimony thus lacks the reliability that Rule 702 and
*Daubert* require.  Accordingly, the Court adopts the *Crawford* court's reasoning to hold that Dr.
Smith may not testify about Plaintiff's hedonic damages based on his willingness-to-pay
methodology.

## IV. CONCLUSION

After carefully considering the entire file in this matter, the parties' submissions, and the
applicable law, and for the above-stated reasons, the Court hereby

**ORDERS** that Defendant's motion for summary judgment, *see* Dkt. No. 44, is
**DENIED IN PART and GRANTED IN PART**; and the Court further

**ORDERS** that Defendant's motion for summary judgment as to Plaintiff's first cause of
action for violation of Title IX of 20 U.S.C. § 1681 *et seq.*, under the theories of erroneous
outcome and selective enforcement, and parallel fifth cause of action for violations of the New
York State Human Rights Law is **DENIED**; and the Court further

**ORDERS** that Defendant's motion for summary judgment as to Plaintiff's second cause
of action for breach of contract is **DENIED**; and the Court further

**ORDERS** that Defendant's motion for summary judgment as to Plaintiff's third and
fourth causes of action, interpreted as violations of the breach of the covenant of good faith and
fair dealing and equitable estoppel, is **GRANTED**; and the Court further

**ORDERS** that Defendant's motion to preclude Plaintiff's expert, Dr. Stan V. Smith,
Ph.D., from testifying about hedonic damages, *see* Dkt. No. 45, is **GRANTED**; and the Court
further

**ORDERS** that the trial of this action shall commence at **10:00 a.m.** on **September 14, 2020**, in **Syracuse, New York.** The Court will issue a separate Final Pretrial Scheduling Order, setting forth the deadlines for filing pretrial submissions, including motions *in limine*, at a later date.

**IT IS SO ORDERED.**

Dated:  April 30, 2020
       Syracuse, New York

Frederick J. Scullin, Jr.
Senior United States District Judge